ORCHARD SHOPPING CENTER, INC., Plaintiff-Appellant, v. MICHAEL CAMPO et al., Defendants-Appellees.

Fifth District   No. 5—84—0745

Opinion filed November 19, 1985.

Patrick M. Flynn, of Jennings, Flynn & Guymon, of Belleville, and R. W. McGovern, of R. W. McGovern, Ltd., of Fairview Heights, for appellant.

Robert J. Sprague, of Sprague, Sprague & Ysursa, of Belleville, for appellee Michael Campo.

William C. Evers III, of Collinsville, for appellee John Rimar.

PRESIDING JUSTICE JONES delivered the opinion of the court:

The plaintiff, Orchard Shopping Center, Inc., brought this action to recover unpaid rent in the amount of $16,300 and attorney fees and costs from the defendants Michael Campo and John Rimar. The action was based on a written lease agreement between the plaintiff as lessor and Michael Campo and Gerald Hillyard as lessees. Gerald Hillyard died prior to the commencement of the suit. The plaintiff alleged in its first amended complaint that Gerald Hillyard and Michael Campo had assigned their interest to John Rimar. Following a bench trial the trial court found that there had been an oral modification of the lease between plaintiff and defendant Campo, which had resulted in a rescission of the lease agreement. The trial court found further that plaintiff's actions estopped their claim regarding defendant Campo. The court found the defendant Rimar liable for damages during the period in which he was in possession of the estate. The court entered judgment against plaintiff in favor of defendant Campo and in favor of plaintiff against the defendant Rimar in the amount of $1,300 and denied the plaintiff's claim for attorney fees. The trial court also entered judgment in favor of the defendant Rimar against the defendant Campo on the counterclaim of the latter. The defendant Rimar's post-trial motion for modification of the judgment, by crediting him with a $650 deposit, was denied. The plaintiff brought this appeal raising three issues: (1) whether the trial court's findings that defendant Campo was released from liability and that plaintiff was estopped from its claim against him was against the manifest weight of the evidence; (2) whether the trial court erred in finding defendant liable only for the time he was in possession of the property because, the plaintiff urges, the agreement with Rimar was an assignment

rather than a sublease; and (3) whether the denial of attorney fees and costs was erroneous. No appeal has been taken concerning the part of the judgment dealing with the counterclaim.

The five-year lease, effective June 15, 1978, between plaintiff and Hillyard and Campo, d/b/a Quality Meat and Produce, was executed on May 16, 1978. In paragraph 36 the lease provides that it "contains the entire agreement between the parties and executory agreement made hereafter shall be ineffective to change, modify, or discharge this lease in whole or in part, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification or discharge is sought."

At the hearing conducted on September 5, 1984, the plaintiff called the defendant Campo as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102). He testified that he and Hillyard had rented the premises in question to operate a butcher shop. After nine months of operation, the butcher shop did not generate enough income to support "two families," whereupon Campo sold his share of the business to Hillyard. The defendant, likewise, called the defendant Rimar as an adverse witness. He testified concerning the "Sublease Agreement," prepared by his attorney, between himself as "sublessee" and Hillyard as "sublessor" of the premises of the butcher shop. Rimar's son had operated a butcher shop in the premises between approximately December of 1979 and November of 1980, at which time the witness had executed a seven-day option to cancel the "Sublease Agreement" by presenting the cancellation notice to Hillyard.

Frank King, an owner and officer of the plaintiff corporation, testified concerning the "Lessor's Consent to Sublease," dated December 15, 1979, by which the plaintiff consented to the "subleasing" to Rimar of the premises in question. He testified further that the monthly rental for the property in question was $650 and that rent had been paid from September 15, 1978, to August 15, 1980. He had, he said, received a check for $1,300 on October 8, 1980, that had been returned for insufficient funds. That check would have paid the rent through October 15, 1980. Once the property became vacant he received inquiries from persons interested in renting it, but none of them resulted in rental of the property prior to October of 1982, he said, when the Son-Life Fellowship Church went into possession of it. He testified that during the period of vacancy he had not refused to rent to anyone, that during that time Son-Life Fellowship Church, which already rented certain space from plaintiff, had expressed the wish to the plaintiff to rent additional space, and that the plaintiff

would have preferred high-volume retail-sales lessees in the shopping center.

Richard McGovern, an attorney and an owner and officer of the plaintiff, likewise, testified that the property was vacant from the latter part of 1980 until October of 1982, when Son-Life Fellowship Church took possession of it. On cross-examination he stated that he did not recall having told Campo that he was going to be released from the lease but recalled that after Campo and Hillyard had terminated their business relationship the witness had talked with Campo "about owing the money." In his deposition, however, taken on March 3, 1982, he had recalled having spoken with Campo "about somebody taking over the lease" but made no mention in the deposition of having talked with Campo about any money owed. The witness testified further that he had prepared an "Agreement," dated September 30, 1981, by which Sharon Hillyard, widow of Gerald Hillyard, who died on January 13, 1981, would pay $9,150, to the plaintiff. McGovern had taken the proposed agreement to her house and presented it to her, but she would not sign it. He denied that he had told Sharon Hillyard that Campo was no longer liable on the lease and stated that he had not approached Sharon Hillyard until that time for the reason that "she wasn't liable." He testified that prior to October of 1982 the Son-Life Fellowship Church was already leasing some space from plaintiff and that between October of 1980 and October of 1982 the church had approached him about leasing certain additional space, which was already rented by P.N. Hirsch. On cross-examination he said that the church never asked to rent the property in question other than just prior to October of 1982, as, for example, in 1980 or 1981 and that "[h]ad they asked me, I would have been glad to rent it to them." He stated further on cross-examination that he had had no objection to the arrangement of Hillyard and Rimar because "It was just a sublease," by which McGovern said he meant that "[Rimar] wasn't taking an assignment of the existing lease." Rimar had not, he said, told him that the business was a failing one that he was going to try to salvage and that because of its history of failure Rimar had agreed with Hillyard to cancellation on seven days' notice. On redirect he said that the plaintiff had never released Hillyard, Campo, or Rimar in any way from any liability arising out of the lease and "Sublease Agreement" and stated further: "I will repeat it very clear [sic]. I never told anybody that they were released from any obligations under any of these documents." He asserted that he had never told any of the three persons involved that he had released any of the other parties from their obligations under "these documents." Asked on re-cross, "And just so

I get it clear in my mind, the only time that Son-Life came to you and wanted to rent part of this shopping center that they didn't get is what they wanted to get the P.N. Hirsch store moved around, is that correct?" he answered, "That's correct."

The defendant Campo called Sharon Hillyard to testify in his behalf. She stated that McGovern had come to her house around September 30, 1981, with the proposed agreement, about which he had testified. She described the episode in the following way:

"He came to the house with this paper and asked me if I would sign it. He said you know and I know that Mike Campo is no longer on the lease. And he said the person that you seem to be you would (I would assume that you would like to clear up all of your husband's debts. And I said, yes, I would, but I would like to show this to my brother before I sign anything. And instead of taking it to my brother, I took it to my lawyer, Rich Tognarelli; and he told me that if I had signed it, that I would have been legally responsible to pay this amount. But he did say and I know for a fact that Mike Campo was not on the lease, that my husband had taken him off."

She testified further that McGovern had refused to lease the building to Tom Geers, who was interested both in buying the equipment in the butcher shop from her and in renting the premises in question in order to operate a butcher shop, unless the witness paid plaintiff $9,150, which was the amount stated on the proposed agreement and constituted the amount of rent unpaid as of September 30, 1981. She stated that her husband had told on "[s]everal" occasions that Campo had been "taken off the lease." She said, "He just told me that he had him taken off. Then I seen [sic] a lease paper with just my husband's name on it, a new lease drawn up." She had been unable to find it in the butcher shop, recalling it in a file cabinet or desk in the butcher shop. She said that she had seen the lease at her home when her husband had brought it home and "when I got back into the butcher shop, the file cabinet and the desk and everything had been moved to the other side of the building and the church was using them." "Shortly after Mike Campo got out of the store," she said, her husband "just put it on the table and said there is the new lease, and Mike is off of it." She elaborated: "I remember my husband bringing the paper, laying it on the dining room table, saying here is the new lease, Honey; and he said Mike is off of it. I said well, good, because we knew how bad Mike wanted off the lease." She stated that the new lease was between plaintiff and her husband alone. She stated that she knew Rimar had stopped operating the butcher shop

because he had notified her husband in writing that he was leaving the butcher shop on a certain date. After her husband's death, she said, her brother, Ed Nesbitt, had tried to help her sell the business and that

> "he had talked to Dick McGovern and that he had told him that we had a buyer [Tom Geers] for the store and that he wanted to work out a new lease for this Tom Geers, and Dick McGovern said fine; and I got all of the equipment fixed and everything, and then Dick McGovern wouldn't lease the building to him."

The proposed agreement of September 30, 1981, which is signed by Richard McGovern for the plaintiff, states in part:

> "To induce Orchard to cancel said lease and enter into a new lease with Thomas Gehrs [sic] and Robert A. Gehrs [sic], Sharon Hillyard has agreed to pay to Orchard the sum of $_____ representing the delinquent rent on the premises and therefore the parties agree as follows:
>
> * * *
>
> 2) The undersigned will pay to lessors the sum of $9150.00 at the rate of $650.00 a month starting on October 15, 1981, and on the 15th day of each month thereafter * * *."

She testified that McGovern had refused to give Geers the lease until she had paid "the 9,000" and that McGovern had told her during a telephone call she had made to him concerning the lease with Geers that McGovern was "going to lease the building to [Geers] if I paid the $9,150." She stated that both Geers and McGovern had told her that a written agreement was being drawn up.

Also testifying for defendant Campo was Jack Walter, associate pastor and administrator of Son-Life Fellowship Church. He stated that he had had "maybe four to six" discussions with McGovern about renting the premises where the butcher shop was located. The discussions had occurred between the fall of 1980 and the time that the church had taken possession of the premises but that McGovern always indicated that that particular property was unavailable. At the same time the church also sought to rent from the plaintiff the area in the shopping center occupied by P.N. Hirsch, but that effort did not materialize. The church was already leasing some space from the plaintiff but found that it needed more. No agreement could be reached at that time, he said, about renting the premises where the butcher shop was located because, according to McGovern at about the beginning of 1981, of "the fact that there was [sic] legal ramifications still involved with those that were—had dealt with the butcher

shop." Rent for the premises where the meat market was located was not discussed during the time in question because the church was advised that the property was not available. The witness did not know John Rimar, Michael Campo, or Jerry Hillyard "at all."

Testifying in his own behalf, Michael Campo stated that he had gotten out of the business in question in April of 1979. In the middle of April of 1979, he said, he had called McGovern to discuss the lease with him and to tell him that he and Hillyard were no longer partners. He stated, "Mr. McGovern said that there was no problem, that him [sic] and Jerry would draw up another lease and remove me from the lease or something to [sic] that nature. There would be a new lease, or they would take me off the existing lease." On cross-examination he explained further: "I told Mr. McGovern that I wanted to get off the lease, and he said that that was no problem that him [sic] and Jerry would sign another lease and I would be taken off or they would scratch something out and initial it, whatever that meant." He had neither talked with McGovern on any other occasion nor heard anything from McGovern from the time of the telephone conversation with him until he received a notice of default late in October of 1981. When he received the notice of default he had done nothing about it, he said,

> "[b]ecause I felt that due to the conversation that Mr. McGovern and I had had that I had been removed from the lease because at a later point in time that $10,000 note that I had with Jerry, I was trying to collect the money or some of the money because he got behind in his payments; and I had asked him a number of times if the lease was taken care of, and he said it's all taken care of, was the last time I talked to him. I thought I was totally off of the lease, which was what Mr. McGovern had stated to him over the phone, that him [sic] and Jerry would take care of it."

He stated that had he not been "off the lease" he "certainly" would have taken some action when he found that the lease was in default: "I would have tried to get somebody in there or done something, made them some payments or something. I would have tried to have done something." Hillyard had, he said, told him that he had been taken off the lease and not to worry about it "[t]wo to three" times. Asked why he did not try to obtain a release in writing, he answered, "I did, sir, Jerry died. He was to get me a copy, and Jerry died before I got the copy. Jerry was to get me a copy. He told me I was taken off, and he was to get me one, and he did not get it to me."

Testifying in his own behalf, John Rimar discussed the provision

in his agreement that he could terminate the agreement upon seven days' notice, as he had, in fact, done in October of 1980. He stated that when he was about to enter into the agreement he had gone to McGovern's office to talk with him because McGovern had wanted to meet with him and Hillyard to discuss their plans. At that meeting, he said, McGovern had described the notice period as "rather short notice." In response Rimar

> "explained to him again that the business was failing and it was an attempt on our part to recoup it; and should we not be able to do that, we would like a quick way out. He then looked at Mr. Hillyard and said I wanted to make it clear to you that I'm looking to you for the rent, not from him, that he's obligated to you but you're obligated to me."

He testified that the rent had been paid "current to the day that we occupied the premises." He said that after he had given McGovern a copy of the "Sublease Agreement," a financial statement, and the back rent owed by Hillyard at that time, McGovern had consented to the "Sublease Agreement." Had McGovern told him he would be liable for "years and years of advance rent even when" he was not in possession of the premises, he said he would not have entered into the agreement.

In rebuttal McGovern testified that he had never in any way released Michael Campo from any liability, that no lease between only plaintiff and Hillyard had been executed, and that he had never refused to lease the property in question to Tom Geers. He said that Geers had made a formal offer and had agreed to enter into a lease agreement with plaintiff and that he, that is, McGovern, had prepared a lease, which had been signed by King, but that Geers had indicated that "he didn't want to go through with the deal; otherwise, I would have signed the lease with him." Asked whether plaintiff would have entered the lease agreement with Geers even if no arrangements had been made concerning the unpaid rent, he answered in the affirmative "because we still would have the same cause of action we've got now, and we wanted a tenant that was paying, and we wanted a butcher shop because it was a retail store." Asked on cross-examination why he had attempted to get $9,150 from Sharon Hillyard, he answered, "Because then we wouldn't have to sue and also because Mr. Nesbitt repeatedly promised me that he would pay it." The witness said he had never told Sharon Hillyard that she had to pay it "because she wasn't liable. But I did indicate to her that if she did pay it, it would certainly facilitate the sale." He said that the agreement he had prepared was Nesbitt's idea. Asked why, if Sharon Hillyard was not lia-

ble, he had drawn up an agreement for her to pay over $9,000, he responded, "Well, because I was hoping it would be worthwhile for her to pay that based upon how much money that the estate was going to get by the sale of the business and the equipment." Asked why, if he felt that other persons were liable for the overdue rent, only Sharon Hillyard's name was on the proposed agreement, he answered, "Well, because had the money been paid, that would have brought the lease current, and there would have been no need to pursue it against anyone else." He did not, when Sharon Hillyard refused to pay the $9,150, approach Campo or Rimar with the same proposal.

A review of the record here shows that there were serious conflicts between the testimony of Richard McGovern and that of the witnesses for the defendant Campo. Such conflicts are for the trier of fact to resolve. The trial court had the opportunity unavailable to the court on review to observe the manner and the demeanor of the witnesses when testifying. Credibility of the witnesses is a matter for the trial court to determine, and a court of review will not disturb its findings when evidence is contradictory unless they are against the manifest weight of the evidence. (*Johnson v. Fulkerson* (1957), 12 Ill. 2d 69, 145 N.E.2d 31; *Northern Trust Co. v. City of Chicago* (1954), 4 Ill. 2d 432, 123 N.E.2d 330.) The plaintiff does not contend that, as a consequence of the prohibition in the lease against oral modification, the written contract could not be modified orally (*cf. Park v. Dealers Transit, Inc.* (7th Cir. 1979), 596 F.2d 203 (Illinois courts would allow an oral modification of a written contract despite contractual prohibitions against such oral modification)), and we make no determination in that regard. The finding of the trial court that there was an oral modification of the lease between the plaintiff and the defendant Campo was not against the manifest weight of the evidence, assuming that the trial court resolved questions of credibility and relevant conflicts in the testimony in favor of the witnesses for the defendant Campo. The judgment of the trial court indicates that it found these witnesses credible. As a consequence, we must disagree with the plaintiff that the evidence of the modification of the lease was not, as plaintiff asserts it must be, clear and convincing.

Estoppel is the good faith reliance by one party, to the extent of a change of position to his detriment, upon the conduct of the other as a result of which that other party will not be permitted to raise a contention inconsistent with his misleading conduct. (*Vendo Co. v. Stoner* (1982), 108 Ill. App. 3d 51, 438 N.E.2d 933.) Again, assuming that the trial court resolved questions of credibility and relevant conflicts in the testimony in favor of the witnesses for the

defendant Campo, the finding of the trial court that the actions of the plaintiff served as an estoppel against its claim as to the defendant Campo was not against the manifest weight of the evidence. Once again, inasmuch as the judgment of the trial court shows that it found the witnesses for the defendant Campo to be credible, we must disagree with the plaintiff that the evidence of estoppel was not clear, precise, and unequivocal (see *Joliet Mass Transit District v. Illinois Fair Employment Practices Com.* (1980), 85 Ill. App. 3d 270, 407 N.E.2d 80).

■ The trial court expressly found that the modification of the lease was "supported by adequate consideration in that each party forfeited their [*sic*] rights under the lease." The plaintiff contends, in its argument pertaining to the issue concerning the manifest weight of the evidence, that the release claimed by the defendant Campo lacks valid consideration. However, as the defendant Campo states in his brief, a yielding up of a lease is sufficient consideration for release of the covenant to pay rent (*Wohl v. Yelen* (1959), 22 Ill. App. 2d 455, 161 N.E.2d 339). Further, the surrender of the premises may be valuable consideration for release of a lease. (*Home Life Insurance Co. v. Franklin* (1940), 303 Ill. App. 146, 24 N.E.2d 874.) Hence, the argument is not well taken.

■ With regard to the second issue presented for review, pertaining to the liability of the defendant Rimar for unpaid rent accruing after he went out of possession of the premises, the plaintiff maintains that the agreement between Rimar and Hillyard was an assignment, as opposed to a sublease, and seeks to deduce the defendant's liability therefrom. The instrument in question, which is entitled "Sublease Agreement," refers consistently throughout to "Sublessors" and "Sublessee." Rimar testified that Michael Campo's name as one of the "Sublessors" was marked out and the marking out initialed by Rimar and Hillyard because Campo was no longer associated with Hillyard in the operation of the business at the time the instrument was executed. Preliminarily, we note that the legal effect to be given an instrument is not to be determined by the label it bears or the technical terms it contains. (*Chemical Petroleum Exchange, Inc. v. Metropolitan Sanitary District* (1980), 81 Ill. App. 3d 1005, 401 N.E.2d 1203.) Paragraph two of the instrument provides that "[i]n consideration of the above covenant of Sublessors; [*sic*] Sublessee agrees to follow all the terms and conditions of the original lease." Paragraph five specifies in pertinent part:

"As a further condition of this Sublease Agreement, Sublessors agree as follows:

* * *

(e) That Sublessee may terminate all and any of his obligations under this Agreement, for any reason, upon seven (7) days' written notice to Sublessors at their last known address."

Paragraph seven of the agreement states, "The term of this Lease Agreement shall coincide with the term of the original Lease Agreement."

As the court stated in *Danaj v. Anest* (1979), 77 Ill. App. 3d 533, 534, 396 N.E.2d 95, 96,

"It has long been the law that where one assigns his whole estate without reserving a reversionary interest to himself, a privity of estate is immediately created between his transferee and the original lessor, and in such a case, the transfer is an assignment. (*Sexton v. Chicago Storage Co.* (1889), 129 Ill. 318, 21 N.E. 920; *Urban Investment & Development Co. v. Rothschild & Co.* (1975), 25 Ill. App. 3d 546, 323 N.E.2d 588.) However, if any reversion in the lease premises is retained or reserved, no matter how small, the privity of estate between the transferee and the original lessor is not established and there is no assignment."

In *Danaj* the agreement in question provided that the transferee was to remain in possession of the premises *"so long as"* (*Danaj v. Anest* (1979), 77 Ill. App. 3d 533, 534, 396 N.E.2d 95, 96) he operated a gas station thereon. The court concluded that the language did not create a reversionary interest in the transferor because such language creates a determinable fee, and, where one grants a determinable fee, there is no reversion in the grantor.

Whereas *Danaj* addressed the effect of the language of a fee simple determinable upon such a transfer, *Sexton v. Chicago Storage Co.* (1889), 129 Ill. 318, 21 N.E. 920, considered the effect of the transferor's reservation of a right of reentry for the transferee's breach of a covenant. In *Sexton* the lessor, who was Sexton, and the lessee, Cole, entered into two leases until May 1, 1888. Thereafter the lessee entered into a lease of the same premises to the Chicago Storage Company, likewise, until May 1, 1888, so that, as the court said, "the terms all end at the same instant of time. No space of time, however minute, therefore can, by any possibility, remain after the term of the storage company has ended, before the expiration of the terms in Cole, in which he could enter upon or accept a surrender of the premises." (129 Ill. 318, 326, 21 N.E. 920, 920.) The transfer from Cole to the Chicago Storage Company had provided that, for failure of the latter to pay rent or for default in other covenants, Cole could reenter

the premises. Before the expiration of the term, Sexton dispossessed the Chicago Storage Company because of Cole's failure to pay rent due to him. The court determined that Chicago Storage Company was an assignee of the term of Cole rather than a sublessee under him, concluding that no portion of the term granted to Cole by the leases from Sexton remained in Cole upon his transfer to the Chicago Storage Company and relying upon the proposition that a right to enter for breach of a condition subsequent is not a reversion or an estate in land but is a mere chose in action. In the instant case, however, the situation presented is neither that involving the language of a determinable fee, as in *Danaj*, nor that involving a right to reenter for breach of a covenant, as in *Sexton*. We have been cited to, and our research has disclosed, no case in Illinois calling for a determination of whether an agreement is an assignment or a sublease where the transferee has had the option to terminate the agreement.

Virtually identical to the instant case, however, is the Indiana one of *Indian Refining Co. v. Roberts* (1932), 97 Ind. App. 615, 617, 181 N.E. 283, 284, in which the lessee who held the premises in question for a term of three years commencing on November 1, 1929, transferred to a third person for a term of three years also commencing on November 1, 1929, with the provision that the transferee "may terminate this agreement at any time by giving [the transferor] ten (10) days notice of its intention to do so." The court held that the instrument of transfer was a sublease and not an assignment, reasoning as follows:

> "The estate created was an estate or tenancy for years with the possibility of being terminated at an earlier date than the time stated in the lease. It was a *tenancy for years with a special limitation.*
>
> It is to be noted that [the transferor] held the premises in question for a 'term of three years, commencing November 1, 1929,' without any limitation or possibility of termination on his part whatever; that [the transferee] took the premises from [the transferor] for a term of 'three years from Nov. 1st, 1929,' retaining in itself the right to terminate by giving a specified notice. In other words, [the transferor] held the premises for a term of years unlimited; [the transferee] held the premises for a term of years with a 'special limitation.' [The transferee] might have occupied the premises for ten days, six months, or for the full three years. Under such circumstances, it cannot be said that [the transferee] received all the interest in the term held by [the transferor], but it must be conceded that [the

transferor] retained some interest in the premises to himself. Under the authorities supra, if the [transferor] retained some interest, no matter how small, the transaction is thereby prevented from being an assignment, but is a sublease ***." (Emphasis in original.) (97 Ind. App. 615, 634-35, 181 N.E. 283, 290.)

Likewise, in the instant case, the transferee might have occupied the premises for as little as seven days or as much as the remainder of the original five-year term. In fact, Rimar occupied the premises for about one of the approximately 3½ years remaining of the original term when he exercised his option to terminate the agreement upon seven days' written notice. Under such circumstances it cannot be said that Rimar received all of the interest held by Hillyard or that Hillyard did not retain some interest in the term. By virtue of the provision allowing Rimar to terminate the agreement upon seven days' written notice, Hillyard reserved a reversionary interest to himself. Therefore, we hold that the instrument of transfer was a sublease and not an assignment.

Attendant to its contention that the agreement between Hillyard and Rimar was an assignment, the plaintiff asserts in its brief that privity of estate existed between Rimar and the plaintiff and that "by reason of the privity of estate, Rimar is liable to Orchard for rent due under the original lease." In his brief Rimar states that "only a privity of estate and not a privity of contract was created" between him and the plaintiff under the language of the agreement between him and Hillyard. However, we have established that the agreement between Rimar and Hillyard was a sublease and not an assignment and that, as a consequence, no privity of estate existed between Rimar and the plaintiff. Since the plaintiff's argument is premised upon the existence of privity of estate between the plaintiff and Rimar, we need consider no further the plaintiff's argument concerning Rimar's liability for rent due pursuant to the original lease.

Concerning the final issue presented for review, the plaintiff states that paragraph 31 of the lease agreement between it and Campo and Hillyard explicitly allows plaintiff the costs of any suit arising under the lease together with reasonable attorney fees. The plaintiff maintains that their agreement was "subsequently assumed by Rimar" but cites no authority pertaining to this assertion. In the agreement between Rimar and Hillyard there is no mention of payment of the lessor's costs and attorney fees by the sublessee, the only express reference to attorney fees being in paragraph six of that agreement: "In the event that Sublessee has to resort to a Court of

law to enforce any of the terms of this Agreement, Sublessors shall pay all his costs of enforcing this Agreement, including reasonable attorneys' fees." For these reasons and the further one that the plaintiff was an unsuccessful litigant with regard to the defendant Campo (see *Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 465 N.E.2d 139), we conclude that the trial court properly denied plaintiff's claim for attorney fees.

Affirmed.

HARRISON and KASSERMAN, JJ., concur.