*In re* MARRIAGE OF KATHRYN JEANETTE REEDER, Plaintiff-Appellee, and ROBERT O. REEDER, Defendant-Appellant.

Fifth District   No. 5—85—0633

Opinion filed July 29, 1986.

JONES, J., dissenting.

R. N. Gandy, of DuQuoin, for appellant.

William C. Norton, of Conn, Clendenin, North & Farris, of Sparta, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Robert O. Reeder, appeals from a judgment of the circuit court of Jackson County which denied his motion to terminate maintenance payments to plaintiff, Kathryn Reeder; found that he owed plaintiff $2,725 in maintenance arrearages; and awarded $1,500 in attorney fees to plaintiff's counsel. Defendant contends that the circuit court's judgment is against the manifest weight of the evidence and that its award of attorney fees is unfair and excessive. Because we find these contentions to be without merit, we affirm.

Defendant is 46 years old and is employed by Consolidated Coal Company. Plaintiff, age 43, is a cook. Neither has a post-high school education. The parties were married July 25, 1959, and lived together until their separation in April 1984. They have two children, both adults, and two grandchildren. Their marriage was dissolved by a judgment entered by the Jackson County circuit court on December 5, 1984. At that time, the court found that defendant was capable of earning in excess of $37,000 per year but that plaintiff, having only recently reentered the job market, was employed at the minimum wage. The court's judgment of dissolution ordered, *inter alia*:

"That Defendant shall pay to the Plaintiff the sum of $350 per month as permanent, periodic maintenance until the sale of the former marital residence is completed, and thereafter the sum of $500 per month, as permanent, periodic maintenance, such maintenance to commence December 1, 1984, and be payable on the first of each succeeding month thereafter until the death of Plaintiff, her statutory disqualification to receive such

maintenance in a proceeding of this kind, or the further Order of this Court."

Within 30 days of entry of the judgment, defendant filed a motion requesting a rehearing as to the amount of maintenance awarded on the grounds that he had been stricken with a heart problem, could not work and was on disability. The record shows that defendant was unable to work at all in December of 1984, January of 1985 and for the first 20 days of February 1985. During this period he received disability payments of approximately $351, after deductions, every two weeks.

Defendant made none of the maintenance payments to plaintiff as ordered by the judgment of dissolution, even after the former marital residence was sold in May 1985. Plaintiff received only a single check for $75 in March of 1985 as "partial payment." On March 26, 1985, plaintiff therefore petitioned the court for an order requiring defendant to show cause why he should not be held in contempt of court. By order dated March 28, 1985, that petition was granted, and a rule to show cause issued. A hearing thereon was to be held May 16, 1985. On May 15, 1985, however, defendant filed a motion to terminate maintenance pursuant to section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 510(b)), alleging that plaintiff was cohabiting with another person, Thomas Gutjahar, on a resident, continuing, conjugal basis.

The rule to show cause and defendant's motions for rehearing and for termination of maintenance were ultimately taken up by the court at a consolidated hearing held July 11, 1985. At that hearing, testimony was presented by plaintiff; defendant; defendant's sister, Virginia Taylor; Virginia Taylor's husband, William; and Thomas Gutjahar. Certain documentary exhibits were introduced on plaintiff's behalf. In addition, evidence was presented regarding the hours expended by plaintiff's counsel on these various matters and the rates at which plaintiff was charged.

Based upon the foregoing evidence, the circuit court entered a judgment on August 16, 1985, which granted defendant's motion for rehearing and reduced his maintenance obligations for December 1984, January 1985, and February 1985, from $350 per month to $250 per month. That judgment also held that defendant owed plaintiff $2,725, which sum represented the maintenance arrearages due through July 1985, and that he owed plaintiff's counsel $1,500 in attorney fees. Finally, because the court expressly found that plaintiff had not cohabited with another person on a resident, continuing, conjugal basis, defendant's motion to terminate maintenance payments

was denied. Defendant now appeals only from those portions of the August 16 judgment denying his motion to terminate maintenance payments, requiring him to pay maintenance arrearages which accrued after his motion to terminate was filed, and holding that he must pay plaintiff's attorney fees.

Section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 510(b)) provides:

> "Unless otherwise agreed by the parties in a written separation agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis."

Defendant's principal argument on appeal is that the circuit court's refusal to terminate his maintenance obligations to plaintiff pursuant to this provision is contrary to the manifest weight of the evidence. We disagree.

The legislative intent behind section 510(b) is "to provide for the termination of an ex-spouse's obligation to pay future maintenance whenever the spouse receiving the maintenance has entered into a husband-wife relationship with another, whether this be by legal or other means." (*In re Support of Halford* (1979), 70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134.) The termination of maintenance upon the recipient's cohabitation with another person on a resident, continuing and conjugal basis "was most likely added to section 510(b) to end the inequities caused when a former spouse had in fact entered into a husband-wife relationship, although not formalized legally, and was still entitled to maintenance merely because Illinois does not recognize common law marriages." (*In re Marriage of Olson* (1981), 98 Ill. App. 3d 316, 320-21, 424 N.E.2d 386, 396, quoting *In re Marriage of McGowan* (1980), 84 Ill. App. 3d 609, 614, 405 N.E.2d 1156, 1160-61.) Consistent with this view, termination of maintenance because of resident, continuing and conjugal cohabitation by the recipient spouse requires a showing that she is involved in a *de facto* husband-wife relationship. (See *In re Marriage of Clark* (1983), 111 Ill. App. 3d 960, 961, 444 N.E.2d 1369, 1370.) A "lesser involvement" by the spouse receiving maintenance is insufficient to meet the standards of section 510(b). See *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.

Section 510(b) does not represent an attempt by the legislature to control public morals. (*In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.) Our supreme court has now recognized that proof of sexual intercourse or sexual conduct be-

tween the spouse receiving maintenance and the person with whom she is living is unnecessary to establish cohabitation on a conjugal basis under this provision. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 468, 478 N.E.2d 376, 381.) At the same time, the right of the recipient spouse to maintenance is not voided simply because she lived with another man. *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.

█▌ The requirement of a *de facto* husband-wife relationship is related to the underlying rationale for maintenance. Maintenance is predicated upon a need for support by the spouse who is to receive maintenance. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 467, 478 N.E.2d 376, 381.) Accordingly, in applying section 510(b),

> "an important consideration, divorced from the morality of conduct, is whether the cohabitation has materially affected the recipient spouse's need for support because she either received support from her co-resident or used maintenance monies to support him." 106 Ill. 2d 456, 467-68, 478 N.E.2d 376, 381, quoting *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473.

██ █ The burden of proving a *de facto* husband-wife relationship rests with the spouse seeking to terminate maintenance. Whether such a relationship exists is a factual determination. (*Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 301, 392 N.E.2d 764, 768.) Each case where termination of maintenance is sought under section 510(b) will involve a unique set of facts, because no two personal relationships are alike. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 466, 478 N.E.2d 376, 380.) A trial court's finding that the recipient spouse is not living with another person under circumstances amounting to a *de facto* husband-wife relationship will therefore be affirmed unless it is contrary to the manifest weight of the evidence. See, *e.g., Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 301, 392 N.E.2d 764, 768.

The evidence here showed that plaintiff moved into a house owned by Thomas Gutjahar in August 1984. The house has three bedrooms, a kitchen, living room and bathroom upstairs, and a full basement. The basement is finished with insulated, plasterboard walls and has a concrete floor. It contains a utility room, a combined kitchen and living-room area, a bedroom and some bathroom facilities, but no toilet. The basement kitchen includes cabinets, a sink, a stove and a refrigerator. The basement bedroom is furnished with a metal-frame bed, highboy and dresser. An extension telephone has also been installed.

Gutjahar, who is divorced, resides in the house with his 16-year-old son and his 79-year-old mother. These three individuals occupy the three upstairs bedrooms. Plaintiff resides in and has sole use of the basement. When she first moved in she paid Gutjahar $160 per month in rent, but this was reduced to $120 per month in December 1984 when plaintiff's work hours were cut back. Plaintiff introduced written rent receipts into evidence documenting her payments.

Plaintiff admitted that she has had sexual relations with Gutjahar twice a week, sometimes more often, since she met him, but stated that she sleeps in the basement and has never slept upstairs. Gutjahar confirmed that he and plaintiff do not share the same bedroom, although he recalled that plaintiff had spent the night in his room "a couple of times" before his son moved into the house, which was at Easter time in 1985. Plaintiff and Gutjahar go out to eat or to shows "very seldom," but they "go play cards quite a bit." They are not engaged to be married and have not discussed marriage. Plaintiff testified that she socializes with other friends. When asked if she dated other people, she replied: "No, not really, but if I met somebody, I would."

Plaintiff received certain furniture and appliances in the judgment dissolving her marriage to defendant, which she brought to Gutjahar's house. Some of these items, including living-room furniture, a bedroom set and a television, were originally placed upstairs and were observed there by defendant's sister and her husband when they visited plaintiff in May 1985. Plaintiff explained that she sold the bedroom set, which was in Gutjahar's room, to Gutjahar in December 1984 so that she would have money to buy Christmas gifts for her children and grandchildren. She sold her television to Gutjahar in late May or early June 1985 when she was laid off from her job. The remaining items were all subsequently moved into the basement after the furniture that was there was removed by Gutjahar's nephew for use in his apartment at college. By the time of trial, plaintiff's living-room furniture, dining-room set, refrigerator and stove were all located in the basement.

Because there is no toilet in the basement, plaintiff must use the bathroom upstairs. She apparently does have access to the entire upstairs area and sometimes watches television there. Plaintiff periodically helps Gutjahar's mother prepare meals. She helped make Christmas dinner, and she occasionally has cookouts when her children visit to which she invites Gutjahar's family. In addition, plaintiff and Gutjahar exchanged Christmas gifts in 1984. He gave her a pair of pierced earrings. She recalls giving him a shirt and a pair of pants.

In all other key respects, plaintiff's life is independent of Gutjahar's. They have no joint bank accounts and own no property together. Plaintiff does not contribute toward Gutjahar's mortgage payments and reimburses him on a monthly basis for the long-distance telephone calls she makes on his phone. Plaintiff has her own plates and utensils and normally does her own cooking in the basement. She does her own shopping and her own laundry. She owns her own automobile and has retained her own name. She apparently plays no role in the care, guidance or supervision of Gutjahar's son. The routine household duties for Gutjahar's family are performed by Gutjahar's mother, not plaintiff. Plaintiff is allowed to cultivate flowerbeds outdoors, but does not do the gardening for Gutjahar. Gutjahar and plaintiff do not shop together for groceries or clothing. There is no evidence that they vacation together, or that Gutjahar contributes financially or otherwise toward plaintiff's support.

Defendant was aware that plaintiff resided in Gutjahar's house and observed her car parked there one evening, but had no direct knowledge of plaintiff's living arrangements. His claim that a *de facto* husband-wife relationship existed between plaintiff and Gutjahar turned principally on the testimony of his sister, Virginia Taylor, and Taylor's husband, Robert. The Taylors' testimony concerned a visit they had with plaintiff at Gutjahar's home in May of 1985, just before the hearing on the rule to show cause why defendant should not be held in contempt of court was scheduled to take place.

The Taylors' visit lasted approximately one to two hours, and included a tour of the house and the yard. Twenty minutes of the visit were spent conversing in Gutjahar's kitchen. The Taylors reported that plaintiff referred to Gutjahar's house as "our house" and his bedroom as "our bedroom," and that she said "they" intended to build a lake on the property. Plaintiff expressly denied making such statements. The Taylors also reported seeing furniture and other household items belonging to plaintiff upstairs. Of the basement, Mrs. Taylor stated: "It didn't look really like someone was sleeping down there." Mr. Taylor said the bed in the basement "didn't have the bedspread or anything like that on it." Mrs. Taylor recalled that the kitchen appliances downstairs were not dirty and did not believe they were in use. She did not observe a television there, but saw a woodburning stove, which plaintiff told her she used to fix "beans and things" in the winter time. Finally, Mrs. Taylor claimed plaintiff had told her that she was taking off work for two weeks to do spring cleaning. Taylor understood this to include work on the upstairs area of the house.

Except for the Taylors' testimony regarding the location of plain-

tiff's furniture and other household items, which plaintiff explained, the Taylors' characterization of plaintiff's living arrangements was in serious conflict with that presented by plaintiff and Gutjahar. Such conflicts were for the trier of fact to resolve, because it had the opportunity, unavailable to this court on review, to observe the manner and demeanor of the witnesses when testifying. (*Orchard Shopping Center v. Campo* (1985), 138 Ill. App. 3d 656, 665, 485 N.E.2d 1248, 1254.) The trial court's judgment here indicates that it found the Taylors' testimony lacking in credibility. We see no legally cognizable basis for disturbing this finding, particularly in view of the Taylor's family ties to defendant and the timing of the visit upon which their testimony was based.

■ We cannot condone plaintiff's living arrangements and may have decided this matter differently had we presided at trial. Nevertheless, a reviewing court may not reverse the judgment of the trial court merely because different conclusions could be drawn or if reversal would involve merely a substitution of judgment for that of the trier of fact. (*In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 313, 474 N.E.2d 28, 30.) On the record now before us, there is ample support for the view that plaintiff's need for support has not been materially affected since she began renting Gutjahar's basement and that defendant has failed to sustain his burden of establishing that plaintiff is now involved in a *de facto* husband-wife relationship with Gutjahar. Accordingly, we must conclude that the trial court's finding that plaintiff is not cohabitating with another person on a resident, continuing and conjugal basis is not against the manifest weight of the evidence.

■ The two remaining issues raised by defendant on appeal are that the trial court erred in holding that he owes maintenance arrearages accruing after his motion to terminate maintenance was filed and that it abused its discretion in requiring him to pay attorney fees incurred by plaintiff in connection with that motion. Both of these arguments are premised on the assumption that the court's judgment denying defendant's motion should be reversed. In view of our finding that the court's judgment is not contrary to the manifest weight of the evidence, these arguments are without merit and need not be addressed.

For the foregoing reasons, the judgment of the circuit court of Jackson County is affirmed.

Affirmed.

KARNS, J., concurs.

JUSTICE JONES, dissenting:

I respectfully dissent.

The testimony of the plaintiff, standing alone, when considered in the light of *In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 478 N.E.2d 376, is sufficient to require a finding that the defendant is entitled to relief under section 510(b) of the Act. Such conclusion is not one based upon morals, rather it is a matter of law and of the policy of freeing a husband from being forced to pay maintenance for an ex-wife who chooses to share herself and her life with another without the benefit of wedlock.

It is readily apparent that if the plaintiff were to marry Gutjahar their present lifestyle would undergo no change. The picture presented is that of a rather typical family where the husband and wife both work while the mother of one stays at home and does the household chores of cooking, laundry and cleaning. The plaintiff admits to doing some cooking, to eating meals with the Gutjahars, to watching TV with them, to having her own flowerbed, and so on. Most importantly, the plaintiff gave not the slightest intimation that she intended to move from the Gutjahar house or from the arms of her lover. It was her own admission that she had sex with Gutjahar at least twice a week, and sometimes more. Those episodes occur, of course, at the Gutjahar home—where plaintiff lives. Plaintiff goes out to social functions with Gutjahar, plays cards frequently with their friends and otherwise comports with him in public. It is of no consequence whatever that plaintiff has her own friends and her own activities that she enjoys without Gutjahar—it is the same with practically every wife in the country. In fact, there are many husbands and wives who share less of their time with their spouses than do plaintiff and Gutjahar as revealed here.

The Taylors testified that upon a visit to plaintiff's place of residence the plaintiff, in showing them about, described Gutjahar's bedroom as "our" bedroom and Gutjahar's house as "our" house. Plaintiff did not deny either of these statements attributed to her. As to "our" house, she stated that she did not "recall" saying it was "our" house but she considered it to be Gutjahar's house. As to "our" bedroom, she said, "I don't think I said that because that's not my bedroom."

The facts before us bring this case well within the ambit of the sentence in section 510(b) of the Act that excuses liability for maintenance where the obligee spouse "cohabits with another person on a

resident, continuing conjugal basis." The facts here also align this case with *Sappington*, although in a somewhat reverse situation. In *Sappington* there were no sexual relations because of an impotency. In this case there was an intense sexual relationship coupled with shared living that closely approached that in *Sappington*.

If there is anything immoral about this case, it would be in causing defendant to pay for plaintiff's sharing of herself with Gutjahar in the circumstances shown here under the guise that some policy of the law is being fulfilled.

I would reverse the decision made under section 510(b).