*In re* MARRIAGE OF ELVIS D. NOLEN, Petitioner-Appellant, and FRAN-CES L. NOLEN, Respondent-Appellee.

Fifth District   No. 5—88—0755

Opinion filed August 3, 1990.

David M. Smith, of Springfield, for appellant.

Robert H. Rath, of Rath & Fornes, of Harrisburg, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Petitioner, Elvis D. Nolen, appeals from the judgment of the circuit court of Franklin County denying his motion for termination of maintenance to his former wife, Frances "Miki" Nolen. We affirm.

In May of 1984, the 31-year marriage of Elvis and Miki was dissolved. Under the terms of the final judgment of dissolution of marriage, Miki was to receive from Elvis monthly payments of $791 for maintenance and health insurance costs. In February of 1988, Elvis unilaterally terminated such payments and filed a motion for modification of the judgment of dissolution pursuant to section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 510(c)), alleging that Miki had since on or about August 1, 1986, engaged in a continuous, conjugal, residential cohabitation with Oscar L. DePriest, the half-brother of Elvis' mother, at DePriest's residence in Lemont, Illinois. Miki responded that she was nothing more than a housekeeper/nurse to DePriest in exchange for room and board. After numerous witnesses and several days of testimony, the trial court ruled Elvis did not sustain his burden of proving a continuing conjugal relationship existed between Miki and DePriest so as to terminate spousal maintenance.

The evidence revealed Miki had known Oscar and Esther De-Priest for many years. In June of 1986, Miki stayed at the DePriest residence for several weeks to help take care of Esther, who was then dying of cancer. Miki returned home once Esther passed away, but was asked shortly thereafter to return to Lemont to take care of Oscar, whose health was also failing. After staying at the De-Priest residence for a few months, Miki gave up her rental home in Franklin County and moved many of her belongings to store in De-Priest's basement.

In exchange for room and board, Miki performed most of the cooking, cleaning, and laundry around the DePriest residence. In addition she made certain that DePriest took all of his required medications. Miki and DePriest did the shopping together while he was able, and occasionally would have lunch at a restaurant while

shopping. Miki, however, did not contribute financially to any of the costs of running the residence. While DePriest did turn over some money to Miki for household expenses, all was accounted for with paid receipts. Any items of a personal nature for her alone were paid out of Miki's own funds. The two did not share bank accounts or property of any kind. As for sleeping arrangements, Miki slept upstairs in one of the home's seven bedrooms while DePriest typically slept on a couch in the family room downstairs. The two had no sexual or intimate relations with each other except for an occasional kiss on the cheek. Evenings were usually spent watching television in the family room. Other than occasional restaurant meals, Miki and DePriest did not go to social events together. Unless Miki was friends with DePriest's visitors and specifically requested to stay, Miki often retired to her room until such company left. While DePriest and Miki did spend one Thanksgiving together at DePriest's niece's home, Miki was also friends with the niece. DePriest and Miki spent the night in separate rooms. Miki did not hold herself out to be the wife of DePriest, and DePriest never held her out to be his wife. Moreover, there was some evidence that DePriest had a girlfriend who spent the night at DePriest's house on the average of once every two weeks. Upon his death in July 1988, DePriest left Miki a life estate in some unimproved property in Franklin County.

Elvis' principal argument on appeal is that the trial court's refusal to terminate his maintenance obligation to Miki is contrary to the manifest weight of the evidence. Specifically, Elvis contends the court erred in concluding receipt of food and shelter was inconsistent with a conjugal relationship and further erred in finding there was no adequate proof on the record Miki intended to reside permanently with DePriest.

■■ Section 510(c) of the Illinois Marriage and Dissolution of Marriage Act provides:

> "Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Ill. Rev. Stat. 1987, ch. 40, par. 510(b).)

This section was designed to right old inequities arising from a former spouse entering into a husband-wife relationship, although not formalized legally, while still being entitled to maintenance merely because Illinois does not recognize common-law marriages.

(See *In re Marriage of Reeder* (1986), 145 Ill. App. 3d 1013, 1017, 495 N.E.2d 1383, 1385.) Consequently, a former spouse's obligation to pay maintenance can be terminated pursuant to section 510(c) by order of court whenever the recipient spouse has entered into a husband-wife relationship with another person, whether by legal or other means. (See *In re Support of Halford* (1979), 70 Ill. App. 3d 609, 612, 388 N.E.2d 1131, 1134.) Termination, however, requires a showing that the recipient spouse is indeed involved in a *de facto* husband-wife relationship. (See *Reeder*, 145 Ill. App. 3d at 1017, 495 N.E.2d at 1385.) While proof of sexual conduct between the spouse receiving maintenance and the person with whom the spouse is living is no longer necessary to establish cohabitation on a conjugal basis (see *In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 468, 478 N.E.2d 376, 381), something more than merely living with another person of the opposite sex is required (see *In re Marriage of Bramson* (1980), 83 Ill. App. 3d 657, 663, 404 N.E.2d 469, 473). (See also *Reeder*, 145 Ill. App. 3d at 1017-18, 495 N.E.2d at 1385-86.) A "lesser involvement" by the recipient spouse does not require termination of maintenance. (*Bramson*, 83 Ill. App. 3d at 662, 404 N.E.2d at 472.) Here we have just such an example of "lesser involvement."

■ We further note that whether a husband-wife relationship exists between two people so as to justify termination of maintenance is a factual determination which the spouse seeking to terminate such maintenance has the burden of proving. (*Reeder*, 145 Ill. App. 3d at 1018, 495 N.E.2d at 1386; *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 301, 392 N.E.2d 764, 768.) Consequently, a trial court's finding that the recipient spouse is not living with another person under circumstances amounting to a *de facto* husband-wife relationship will be affirmed unless contrary to the manifest weight of the evidence. *Reeder*, 145 Ill. App. 3d at 1018, 495 N.E.2d at 1386.

■ We cannot say looking at the record before us that the finding Miki was not cohabiting with another person on a resident, continuing and conjugal basis is against the manifest weight of the evidence. Clearly the opposite is true. Miki, plain and simple, was a live-in housekeeper and nurse's aide to DePriest. Contrary to a husband-wife relationship, the two shared little more than a residence and certain friends and relatives. They did not sleep together, or, for that matter, even on the same floor; they did not travel together unless by necessity because of DePriest's ill health; they infrequently socialized together to the point Miki would absent herself

when visitors called on DePriest. They shared no expenses or property, and in fact, Miki exercised so little authority in the DePriest household that she felt obligated to ask permission to move items of furniture for cleaning purposes. DePriest consistently introduced Miki as his housekeeper, and the numerous witnesses who testified at trial who had reason to have visited DePriest at his home during the time Miki was taking care of him all believed DePriest treated her as though she were an employee although with respect. It is with little wonder the private investigator whom Elvis hired to watch Miki and DePriest had little, if anything, to report. Surely a husband-wife relationship involves more than that exhibited from the relationship here.

The nature of Miki's employment as a full-time housekeeper and nurse required she live in her employer's house. Whether her payment was in salary, or in the form of room and board, does not matter. Nor do her reasons for taking such a position. What is important is the lack of any indication that either she or DePriest considered themselves to have a husband-wife relationship. The mere fact there was no agreement between Miki and DePriest as to the length of her employment does not mean the arrangement was intended to be permanent. Miki's belongings were packed and stored in DePriest's basement, ready to be moved at any time.

While it is possible Elvis may have been able to have the amount of Miki's maintenance modified if properly petitioned because of a reduced need for support (see *Sappington*, 106 Ill. 2d at 467, 478 N.E.2d at 381; *Bramson*, 83 Ill. App. 3d at 663, 404 N.E.2d at 473), her relationship with DePriest certainly did not justify termination of all support. Elvis simply did not meet his burden of proving a *de facto* marriage existed between Miki and DePriest as envisioned by the legislature in enacting section 510(c) so as to terminate spousal maintenance in this instance.

Elvis also contends on appeal the trial court erred in finding he did not have reasonable cause to believe Miki was cohabiting in a resident, continuous and conjugal manner with DePriest so as to cease payment of support. Much of Elvis' argument directs blame at Miki for not communicating to him the reason for her presence in DePriest's home. Miki is no longer Elvis' wife. She has no obligation to keep Elvis apprised of her daily movements. What is even more incredulous are Elvis' claims he knew nothing of the true nature of arrangement between DePriest and Miki. DePriest was Elvis' uncle. Elvis surely had the means, without going to the expense of hiring a private investigator, to verify through the family

network Miki's assistance to DePriest. Numerous relatives on both sides, as evidenced by their testimony at trial, were well aware of the situation. Moreover, Elvis knew Miki often helped take care of relatives, including Elvis' own mother, when needed or asked. Elvis has no one else to blame but himself. This is the risk one takes in making unilateral decisions to stop paying maintenance.

For the aforementioned reasons, we affirm the judgment of the circuit court of Franklin County.

Affirmed.

HARRISON and GOLDENHERSH, JJ., concur.