*In re* MARRIAGE OF CLYDE R. LAMBDIN, Petitioner-Appellant, and MARY LEE LAMBDIN, Respondent-Appellee.

Fourth District   No. 4—92—0770

Argued March 17, 1993.—Opinion filed May 27, 1993.

Vigneri & Robinson, of Decatur (Joseph W. Vigneri (argued), of counsel), for appellant.

Wood Law Office, of Sullivan (Steven W. Mayberry (argued), of counsel), for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Petitioner Clyde R. Lambdin (Clyde) appeals the denial of his petition to terminate maintenance in which he alleged his former wife, Mary Lee Lambdin (Mary Lee), was cohabiting with a man on a resi-

dent, continuing, conjugal basis sufficient to justify the termination of maintenance pursuant to section 510(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 510(a)). The trial court held Mary Lee was not cohabiting in such a manner as to justify the termination of maintenance and further held Clyde in indirect civil contempt of court because of his wilful failure to pay maintenance for four months. Clyde's petition to terminate because of Mary Lee's failure to seek gainful employment or because of substantial changes in circumstances was also denied. Mary Lee's petition to increase child support and for contempt was granted. Clyde appeals and we affirm.

Clyde and Mary Lee Lambdin were married on August 3, 1972. They have three natural children: Thomas Ray Lambdin (born July 23, 1974), Penny Lee Lambdin (born December 20, 1976), and Tamera Joanne Lambdin (born September 27, 1978). They adopted Kenneth Gene Lambdin (born May 9, 1969). Clyde filed a petition for dissolution of marriage on January 24, 1989.

A judgment of dissolution was entered on November 16, 1989. Mary Lee was awarded custody of the children and Clyde was to have reasonable visitation rights. Clyde was ordered to pay Mary Lee $55/week per child, for a total of $165 a week in child support. He was further ordered to pay Mary Lee $500 a month in maintenance. Mary Lee was awarded the marital residence, and all other property was to be divided pursuant to the parties' agreement.

Clyde married Diana Carol Lambdin on October 5, 1990. Diana's daughter from a previous marriage and her four children reside with Clyde and Diana on occasion. Clyde is employed by A.E. Staley and has a gross income of $539 a week for a 40-hour week. Diana is not employed outside the home.

Mary Lee baby-sits for three children in her home. She is paid $1/hour per child and can make up to $150 a week if she has the children for the whole week. She also receives approximately $300 in food stamps. She had various part-time jobs during the marriage, but was unable to sustain permanent employment because of a hearing problem.

Clyde filed his petition to terminate maintenance, or in the alternative, for other specified relief on November 27, 1991. He alleged Mary Lee was cohabiting with Charles Geise (Geise) on a resident, continuing, conjugal basis so as to justify the termination of maintenance. Alternatively, Clyde alleged the change in his and Mary Lee's financial circumstances supported a reduction in the amount of maintenance.

Clyde paid all the required child support and maintenance payments until December 1991. At that time, he ceased making the maintenance payments because he believed Mary Lee "had a truck driver living with her." Clyde did not pay maintenance from December 1991 through March 1992. Mary Lee filed her petition for an adjudication of indirect civil contempt because of Clyde's failure to pay the maintenance. She also filed a petition for modification of the judgment of dissolution seeking an increase in child support, alleging Clyde now earns substantially more than he did at the time of the judgment of dissolution. She also sought attorney fees incurred in connection with that petition.

A hearing was held on April 7, 1992, regarding Clyde's petition to terminate maintenance and Mary Lee's petition for contempt and an increase in child support. The trial court entered an order on June 11, 1992, denying Clyde's petition to terminate. The trial court granted Mary Lee's petition for contempt and modified the judgment of dissolution because of a substantial change in Clyde's financial circumstances, and applied the guidelines of section 505(a)(1) of the Act, increasing weekly per-child support from $55 to $67. (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(1).) The trial court also noted its obligation, pursuant to section 508(b) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 508(b)), to award attorney fees to Mary Lee; however, it concluded the evidence submitted by Mary Lee as to the usual, reasonable and customary fees for legal representation provided on her behalf was insufficient to support such an award. Accordingly, no attorney fees were awarded.

Clyde filed a motion to reconsider on August 4, 1992, and Mary Lee filed a motion to strike Clyde's motion to reconsider on August 13, 1992. A hearing on these motions was held on August 14, 1992, at which time the court entered judgment against Clyde in the amount of $4,699 for contempt; however, it held Clyde could purge himself of the contempt conviction by paying that amount pursuant to the purge order. The trial court again denied Mary Lee's request for attorney fees. Clyde timely filed his notice of appeal.

Clyde first contends the trial court's determination that Mary Lee was not engaged in a resident, continuing, conjugal relationship with Geise was against the manifest weight of the evidence. The trial court found Mary Lee "has not entered into or engaged in a relationship whereby she has cohabited with another person on a resident, continuing conjugal basis in a husband-wifelike relationship." The court found Mary Lee's relationship with Geise "has not [a]ffected [her] need for support, because she does not receive support from another

male and has not used maintenance monies to support him." Finally, the court found the relationship to be of a dating type and not of a husband-wifelike relationship, and the cohabitation arrangement was only temporary and not continuing within the meaning of the Act.

■■ Section 510(c) of the Act provides:

"Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated \*\*\* if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." (Ill. Rev. Stat. 1991, ch. 40, par. 510(c).)

Termination, however, requires a showing that the recipient spouse is involved in a *de facto* husband-wife relationship. While proof of sexual conduct between the spouse receiving maintenance and the person with whom the spouse is living is no longer necessary to establish cohabitation on a conjugal basis, something more than merely living with another person of the opposite sex is required. A lesser involvement by the recipient spouse does not require termination of maintenance. (*In re Marriage of Nolen* (1990), 200 Ill. App. 3d 1072, 1075, 558 N.E.2d 781, 783.) The burden of establishing a *de facto* husband-wife relationship rests with the spouse seeking to terminate maintenance. (*In re Marriage of Johnson* (1991), 215 Ill. App. 3d 174, 180, 574 N.E.2d 855, 858.) Each case for termination of maintenance must rest on its own facts, given the unique nature of personal relationships. (*In re Marriage of Sappington* (1985), 106 Ill. 2d 456, 466, 478 N.E.2d 376, 380.) Courts have generally looked at those facts which would lead a reasonable observer to believe that the individuals were husband and wife. *Rosche v. Rosche* (1987), 163 Ill. App. 3d 308, 313, 516 N.E.2d 1001, 1005.

■■ The rationale behind statutory termination of maintenance when the recipient spouse cohabits with another on a continuing, resident, conjugal basis is that it addresses the inequity created when that spouse becomes involved in a husband-wife relationship but does not legally formalize it so that he or she can continue to receive maintenance. (*In re Marriage of Arvin* (1989), 184 Ill. App. 3d 644, 649, 540 N.E.2d 919, 923.) Once an ex-spouse paying maintenance has demonstrated that a husband and wifelike relationship does exist, it should be incumbent upon the maintenance recipient to demonstrate that the relationship in which he or she is engaged is not the type of relationship which was intended by the legislature to justify the termination of the obligation to pay maintenance. *Sappington*, 106 Ill. 2d at 467, 478 N.E.2d at 381.

A trial court's finding that the recipient spouse is not living with another person under circumstances amounting to a *de facto* husband-wife relationship will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Caradonna* (1990), 197 Ill. App. 3d 155, 159, 553 N.E.2d 1161, 1164.

In *Johnson*, this court, in reversing the trial court, held the evidence presented did not establish a continuing, conjugal relationship between the ex-wife and her male friend so as to justify the termination of her maintenance. In that case, there was no evidence of a sexual relationship, no evidence of sharing expenses, and no evidence that the man with whom the ex-wife had a relationship had paid any of her expenses. There was evidence to show the ex-wife liked living at the man's apartment, they behaved affectionately toward each other and the man admitted he was moving his " 'girl friend's' " belongings into his apartment in the near future. However, this court concluded, at most, this evidence established a dating relationship. *Johnson*, 215 Ill. App. 3d at 180, 574 N.E.2d at 859.

On the other hand, in *Sappington*, the supreme court majority held the manifest weight of the evidence did establish that a conjugal relationship existed between the former wife and a male with whom she was cohabiting, reversing the trial and appellate courts. The evidence presented indicated they attended approximately 20 "singles" dances together. The man resided in the former marital residence in the master bedroom and the former wife resided in another bedroom. The man was charged rent, but the former wife did not declare the money on her income tax returns. The man paid cash for household bills, utility bills, food and paper delivery. He had free access to the entire house and performed general maintenance jobs around the house, including mowing the lawn, raking the leaves, and patching the roof. They ate some meals together at the home and the former wife cooked for him and also did some of his laundry. They socialized together but both denied a sexual relationship. They vacationed together during which they shared a motel room and they exchanged birthday and Christmas gifts. (*Sappington*, 106 Ill. 2d at 459-61, 478 N.E.2d at 377-78.) The supreme court concluded the facts presented a relationship that was more like that of a husband and wife rather than that of casual friends. *Sappington*, 106 Ill. 2d at 466, 478 N.E.2d at 380.

The evidence presented here shows Mary Lee owns a house in Sullivan, Illinois, and became involved with Geise in July 1991, some four months prior to Clyde filing the petition to terminate maintenance. Geise is a truck driver and works for a company based out of

Bakersfield, California. She sees Geise whenever he comes to town which is usually every other month. He parks his truck on the property next to her house. The longest time that Geise stayed at her house at one time was five days. Geise does not know anybody else in Sullivan, Illinois. Mary Lee admitted that she and Geise have a sexual relationship although she claims they do not always sleep in her house, but sometimes sleep in his truck, which is parked outside her house. Geise calls her once a day when he is on the road and has other mailing addresses in Virginia, Nebraska, and Utah. Mary Lee testified Geise has a checking account in Utah which is in his name alone.

Mary Lee leased a post office box in Sullivan for him, has the key to the box, and picks up his mail. When he telephones her, she tells him what came in the mail. Geise uses her calling card to make long distance phone calls to her, and he reimburses her for those telephone calls. She either cooks dinner for them when he is in town or they go out to dinner; if they go out, he pays for the dinner. He bought groceries on occasion and has given gifts and money to her children. Geise had some personal belongings at her house, including a shaving kit, which used to be stored in a trunk in her basement. However, after Clyde filed the petition to terminate, Geise moved this trunk of belongings to Mary Lee's mother's house.

Mary Lee and Geise became engaged in November 1991 at which time he gave her a diamond ring. However, she gave the ring back in December 1991 after Clyde filed the petition to terminate maintenance. Geise has been making fewer overnight stays since the petition to terminate was filed. However, she still communicates with him on a daily basis.

Mary Lee testified she had a date with one other man during the time she was seeing Geise. She and Geise have never taken any vacations together nor do they jointly own real estate or personal property. She has her own checking account and they do not have any joint accounts. She characterized Geise as her boyfriend and she does not do his laundry. She does not use the maintenance to buy anything for Geise. He pays no expenses for her other than the long-distance phone calls he makes on her calling card and occasional groceries. Geise does not discipline her kids. He has played chess with her children. He has on occasion answered her telephone.

This court does not have the prerogative to determine, *de novo*, the merits of the petition. The trial court's determination that Mary Lee and Geise were not engaged in a resident, continuing, conjugal relationship was not against the manifest weight of the evidence.

■ Based on the facts and circumstances of this case and our interpretation of *Sappington*, Clyde demonstrated that a husband and wifelike relationship existed between Mary Lee and Geise. Mary Lee was then required to demonstrate that she was not engaged in the type of relationship intended by the legislature to justify the termination of maintenance.

The relationship between Mary Lee and Geise was of a relatively short duration. Although they did have sexual relations, she would see him usually only every other month. They had not taken vacations together, owned no real estate or personal property together, and they had no joint bank accounts. The evidence shows she does not do his laundry and does not use maintenance to buy anything for Geise. Geise does not discipline the children and his principal involvement is playing chess with them. Although there was sufficient evidence presented to grant the petition to terminate, there also was sufficient evidence to deny the petition. In such circumstances, the trial court's decision was not against the manifest weight of the evidence.

Next, Clyde alleges the trial court's determination that his obligation to pay maintenance should remain unaffected in spite of Mary Lee's failure to seek appropriate training or education to become financially independent or because of a substantial change in circumstances was against the manifest weight of the evidence. He contends, first, Mary Lee has failed to seek appropriate training and skills to become financially independent and she has limited herself to employment which will allow her to work independently. Clyde also notes the record is devoid of support for the contention that Mary Lee is medically disabled for purposes of employment.

Clyde further asserts his reduction in overtime, his financial obligation to his new wife, and the fact that Mary Lee's financial circumstances have improved since the time of the dissolution support his position that a substantial change of circumstances has occurred. He notes that on Mary Lee's financial affidavit at the time of the dissolution, she earned $150 a month in baby-sitting while she now asserts she can earn up to $150 a *week* in baby-sitting. Clyde also suggests the money she has received in child support indicates an improvement in her financial status.

A recipient of a maintenance award is under an affirmative obligation to seek appropriate training and skills to become financially independent in the future. The failure to make good-faith efforts to achieve this goal, following a reasonable time frame during which the objective should be accomplished, might form the basis for a petition

for modification pursuant to section 510(a) of the Act. *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 635, 450 N.E.2d 1229, 1234.

The factors to be considered in making an award of maintenance are applicable to modification proceedings. These factors are (1) the financial resources of the party seeking maintenance, including his or her marital property; (2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment; (3) the standard of living established during the marriage; (4) the duration of the marriage; (5) the age and physical and emotional condition of both parties; (6) the ability of the spouse paying maintenance to meet his or her needs while meeting those of the spouse seeking maintenance; and (7) the tax consequences of the property division for the parties. Ill. Rev. Stat. 1991, ch. 40, par. 504(b); *In re Marriage of Martin* (1992), 223 Ill. App. 3d 855, 861-62, 585 N.E.2d 1158, 1163.

■ The trial court did not abuse its discretion in denying Claude's petition to terminate maintenance based on Mary Lee's failure to seek appropriate training or education to become financially independent. Mary Lee only has a general equivalency diploma and is custodian of two minor children. Moreover, she has a hearing problem which requires her to read lips and causes a speech impediment. Finally, only three years have passed since the dissolution of the marriage. Clyde has failed to establish sufficient facts to require terminating maintenance on this basis.

■ Likewise, the trial court did not abuse its discretion in denying Clyde's petition to terminate maintenance based on a substantial change in circumstances. Mary Lee can earn up to $150 a week in baby-sitting; however, she only earned $3,700 by baby-sitting in 1991. She receives approximately $300 a month in public aid food stamps. It is true that Mary Lee may earn more from baby-sitting than she did in 1989, yet it was established that without the maintenance she currently receives, she would be unable to meet her monthly expenses. Clyde's financial circumstances have not changed in such a manner as to justify granting his petition and thus he has failed to show a substantial change in circumstances sufficient to warrant a modification or termination of maintenance.

Clyde next argues the trial court erred in increasing the amount of child support he was required to pay. He contends the substantial change in his and Mary Lee's financial circumstances and the lack of evidence, other than Mary Lee's testimony, showing the children's needs have increased since the time of dissolution support his argument that the increase in child support was an abuse of discretion.

Mary Lee asserts that a comparison of Clyde's financial affidavit from the time of dissolution and the most current one on file indicates a substantial increase in his earnings. She notes that his pay statements from January 1, 1991, through February 1992 indicate he could pay anywhere from $168.23 to $201 a week in child support. She argues that although Clyde is claiming financial difficulty, he is purchasing a new home, owns six vehicles, has taken several vacations, and assumed responsibility for his new wife's credit card debt.

In ordering an increase in the amount of child support, the trial court found Clyde's net weekly income in 1991 would have been $628.14 based on an annual net income of $32,663.16. In his financial affidavit from 1989, Clyde stated a net weekly income of $336.23. The court concluded there was a $291.99 increase resulting in a 46.47% increase over the income which Clyde received at the time of the dissolution. The court noted a similar increase for December 1991 and January 1992 and thus found this to be a substantial change in the financial circumstances of Clyde sufficient to increase the amount of child support. The trial court ordered the modification of the judgment of dissolution and applied the statutory rate of 32% to Clyde's 1991 income to reach a figure of $67/week per child.

Under section 510(a) of the Act, a modification of child support may be made only upon a showing of a substantial change in circumstances. (Ill. Rev. Stat. 1991, ch. 40, par. 510(a).) If the threshold question of substantial change is met, the court, in determining the amount of increase in child support, considers the same factors to consider in formulating the original amount. (*Fedun v. Kuczek* (1987), 155 Ill. App. 3d 798, 801-02, 508 N.E.2d 531, 534.) The relevant factors to be used by the trial court include, but are not limited to: (1) the financial resources of the child; (2) the financial resources and needs of the custodial parent; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the physical and emotional condition of the child, and his educational needs; and (5) the financial resources and the needs of the noncustodial parent. Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(2); *In re Marriage of Stockton* (1988), 169 Ill. App. 3d 318, 325-26, 523 N.E.2d 573, 579.

When determining whether there is sufficient cause to modify, courts consider both the circumstances of the parents and the circumstances of the child. (*Fedun*, 155 Ill. App. 3d at 801, 508 N.E.2d at 533.) Child support obligations may be increased pursuant to the Act based upon the supporting parent's increased ability to pay, regardless of whether the child's needs have also increased. (*Wilson v. Wilson* (1988), 166 Ill. App. 3d 1035, 1038, 520 N.E.2d 1230, 1232.) Courts

have presumed that the needs of a child have escalated simply because he has grown older and the cost of living has increased. An increase in the salary of the parent paying child support is a factor favoring an increase in child support payments. *In re Marriage of Stone* (1989), 191 Ill. App. 3d 172, 174, 547 N.E.2d 714, 715.

The increase in the children's needs must be balanced against the relative ability of the parents to provide for them, and where a change has occurred which creates a substantial imbalance of the child's needs and the parent's support capabilities, modification is required. (*In re Marriage of Schmerold* (1980), 88 Ill. App. 3d 348, 350-51, 410 N.E.2d 629, 631-32.) If the court determines that a substantial change in circumstances has occurred, then the court should determine the amount of child support to be paid. In doing so, the court should follow the statutory guideline set forth in section 505 of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 505), including those provisions for determining the noncustodial parent's "net income" under section 505(a)(3) of the Act (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(3)). (*Stone*, 191 Ill. App. 3d at 174, 547 N.E.2d at 715.) For three children, the minimum support is 32% of the supporting party's net income. Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(1).

A petition to modify child support must be decided on the facts of each case, and the decision rests within the sound discretion of the trial court. *People ex rel. Meyer v. Nein* (1991), 209 Ill. App. 3d 1087, 1088, 568 N.E.2d 436, 436.

■ The trial court did not abuse its discretion in increasing the amount of child support. First, the children have grown older and, thus, this court can presume their needs have increased. Mary Lee testified that as the children are older, they have become more involved in school activities, thereby increasing their expenses. Clyde's financial affidavits indicate he is making a higher salary than he did at the time of dissolution and this was not contradicted. Thus, he can afford to pay the higher amount of child support. He claims he works fewer hours of overtime but his pay stubs indicate he still is receiving several hours of overtime. Mary Lee is not making much more money and testified she needs the child support in order to make ends meet. The court followed the statutory guideline of 32% of Clyde's net income and this figure has not been challenged. Its order does provide for a *pro rata* reduction as each child attains majority.

■ Finally, Clyde contends the trial court erred by holding him in indirect civil contempt for failure to make the required maintenance payments. He alleges his decision not to pay maintenance was not a wilful disregard of the court's order but rather founded upon a good-

faith belief that Mary Lee's cohabitation with Geise justified his termination of the payments.

Mary Lee asserts that a *prima facie* showing of contempt was made by Clyde's admitted noncompliance with the maintenance order. She argues the burden then shifted to Clyde to show why he was unable to pay the maintenance. She concludes his belief that she was cohabiting with Geise on a resident, conjugal, continual basis was an insufficient reason to justify the nonpayment, especially in light of the trial court's ruling that no *de facto* husband-wife relationship existed. She notes Clyde's ability to pay the maintenance was not in dispute. Thus, she believes the trial court did not abuse its discretion.

The noncompliance with an order to pay maintenance constitutes *prima facie* evidence of contempt. Therefore, once the *prima facie* showing is made, the burden shifts to the defendant, who may then defend by showing that he is unable to pay. To prove this defense, a defendant must show that he neither has the money now with which he can pay, nor he has disposed wrongfully of money or assets with which he might have paid. (*In re Marriage of Logston* (1984), 103 Ill. 2d 266, 285, 469 N.E.2d 167, 175.) Financial inability to comply with an order must be shown by definite and explicit evidence. That burden is not met by testimony of a general nature with regard to financial status. (*In re Marriage of Chenoweth* (1985), 134 Ill. App. 3d 1015, 1018-19, 481 N.E.2d 765, 768.) Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court will not disturb that finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Dall* (1991), 212 Ill. App. 3d 85, 97, 569 N.E.2d 1131, 1139.

Clyde testified he stopped making the maintenance payments because in his opinion "Mary Lee had a truck driver living with her." He failed to make the payments for December 1991 and January through March 1992. This noncompliance plus the court's finding of arrearage provides *prima facie* evidence of contempt. *Logston*, 103 Ill. 2d at 285, 469 N.E.2d at 175.

The burden then shifted to Clyde to show he was unable to pay maintenance. Clyde presented no evidence to show he could not pay maintenance. Rather, he stated the only reason he was not paying was his belief that Mary Lee's relationship with Geise justified his unilateral termination of maintenance payments.

Clyde offers *Nolen* for the proposition that his wilfulness in ceasing payments must be judged from a reasonable cause or belief standpoint. In *Nolen*, the ex-husband-payor unilaterally terminated maintenance payments and filed a motion to modify the judgment of

dissolution. He alleged his former wife was engaged in a continuous, conjugal, residential cohabitation with his uncle. The trial court concluded he failed to sustain his burden of proof that such a relationship existed so as to terminate the maintenance order.

The appellate court rejected his argument that he had reasonable cause to believe his former wife was engaged in such a relationship. The court noted the ex-husband blamed his former wife for not communicating the reason for her presence in his uncle's home, *i.e.*, she was the uncle's full-time housekeeper and nurse. The court stated the former wife had no obligation to tell her ex-husband of her daily movements and found incredible his claims that he did not know of the true relationship between his former wife and his uncle. The evidence presented at trial indicated the true nature of the relationship between them and various relatives testified they knew of this relationship. The court concluded "Elvis [(former husband)] has no one else to blame but himself. This is the risk one takes in making unilateral decisions to stop paying maintenance." *Nolen*, 200 Ill. App. 3d at 1077, 558 N.E.2d at 784-85.

The major distinction between *Nolen* and the present case is the fact that the former husband in *Nolen* was not found to be in contempt. The court in *Nolen* only noted the husband's belief that he could stop payment because of his wife's relationship to show it was an *unreasonable* belief based on the evidence presented. It did not state or imply that a reasonable belief that a spouse receiving maintenance was engaged in a resident, continuing, conjugal relationship justified the unilateral termination of maintenance by a paying spouse.

Accordingly, Clyde failed to rebut the *prima facie* showing of contempt because he did not demonstrate an inability to pay maintenance. Therefore, the trial court's finding of contempt was not an abuse of discretion.

For the foregoing reasons, the circuit court of Moultrie County is affirmed.

Affirmed.

COOK and LUND, JJ., concur.