2021 IL App (3d) 190144

Opinion filed March 25, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the Thirteenth Judicial Circuit, |
| KARYN ASPAN, | ) | Grundy County, Illinois. |
| | ) | |
| Petitioner-Appellant, | ) | Appeal No. 3-19-0144 |
| | ) | Circuit No. 2016-D-133 |
| and | ) | |
| | ) | |
| THOMAS R. ASPAN, | ) | The Honorable |
| | ) | Sheldon Sobol, |
| Respondent-Appellee. | ) | Judge, presiding. |
| | ) | |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.
Justices Holdridge and Wright concurred in the judgment and opinion.

_____
–

**OPINION**

¶ 1        The petitioner, Karyn Aspan, appeals the circuit court's order terminating the obligation

of respondent Thomas Aspan (Tom) to pay her spousal maintenance. Karyn argues that the court

erred in finding that she was in a resident, continuing conjugal relationship with Ronald Hessa

(Ron). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        On August 18, 2017, the circuit court entered an order for the dissolution of the marriage of Karyn and Tom. The order required Tom to pay Karyn maintenance for ninety-six months at an annual rate of $24,280. Karyn also received approximately $53,000 on October 16, 2017, from the sale of the marital home. In May 2018, Tom filed a petition to terminate temporary maintenance, alleging that Karyn was cohabitating with her boyfriend, Ron. He also alleged that their relationship started in June 2017. In February 2019, the circuit court held a trial on the petition. The evidence at trial was as follows.

¶ 4        Karyn testified she met Ron in or after August 2016 through his daughter, Tabitha. Karyn and Tom separated around the same time. She then changed her Facebook status from "married" to "in a relationship." She testified that the change was accidental and that she meant to put "it's complicated." In September 2016, Karyn and Ron attended a NASCAR race. She then moved into a mobile home in Gardner, Illinois, where Ron lived full time. Occasionally, Tabitha and her daughters stayed with them. But most of the time, it was just Karyn and Ron at the address. When she moved in, Karyn brought with her nine dogs.

¶ 5        At times her son Michael, who was on parole, stayed with Karyn and Ron. Michael used their address as his parole address. Ron called him "the drifter" and testified that Michael agreed to pay $200 per month in rent but never did. Michael is the sole beneficiary on Karyn's life insurance. In November 2017, he was involved in an accident with Karyn's car, causing total loss of the car. Ron purchased a replacement car that Karyn used exclusively. Karyn initially stated she did not know the purchase price but that she paid $100 per month. She later clarified that the purchase price was $3,500 and that she agreed to make payments until she reimbursed Ron for the car. Ron testified differently, stating that he purchased with the car with a down payment of $800 and that he had an oral agreement with Karyn regarding reimbursing him for it.

¶ 6      In December 2017, Ron purchased a house in South Wilmington, Illinois, which is titled solely in his name. Karyn moved into that house immediately after Ron purchased it, and he joined her after he sold the mobile home in February 2018. Karyn and Ron have lived together in the Wilmington house since that time. Michael also lived there with them for several months. Karyn brought four dogs into the house, while Ron brought two dogs. Each cared for all the dogs.

¶ 7      Prior to Ron purchasing the Wilmington house, Karyn went looking at homes with him. Karyn stated that she intended to purchase a home for herself around the same time. She provided emails from November 2017 to the realtor Sara Powers, indicating she was still searching for a home. She also submitted a lease she allegedly signed on December 23, 2017, on the Wilmington house and a copy of another email she sent to Powers expressing her continued interest in looking for home. She viewed the Wilmington house both with Ron and by herself. She did not recall looking at any other houses with Ron. Karyn told a Grundy County Deputy on January 11, 2018, that she had purchased a home in South Wilmington, using a realtor named "Sara Powers." Karyn attended the home inspection with Powers, but Ron did not attend.

¶ 8      The Wilmington house was purchased with funds from an account held by Karyn and Ron in joint tenancy, with the right of survivorship. Karyn stated that she had opened the account and had later given the bank oral permission to add Ron as a joint tenant because he needed to have an account for 60 to 90 days before purchasing the house. Ron testified that he did not know how much money Karyn had in the account and that he never touched any of it. On October 30, 2017, Karyn transferred $23,000 into the account. On December 21, 2017, she withdrew $12,305 from the account to purchase the Wilmington house. The issuing bank disbursed the money as a cashier's check, with the memo line stating, "Karyn and Ronald

3

Aspan." Karyn also paid for the house appraisal with $415.00 from the account. She testified that Ron gave her cash for the appraisal. After closing on the house, Karyn and Ron went to Red Lobster with a gift card from Powers.

¶ 9　　　In February 2018, Ron and Karyn began living together full time at the Wilmington house, performing basic home keeping tasks, sleeping there every night, and sharing a single bathroom. Karyn painted the living room; she arranged to add a back door to the home and for a fence to be put up. She posted a warning on social media, alleging the individual who put up the door and fence was a thief. At trial, she stated that Ron told her to post the warning. In April 2018, Karyn paid $345.60 for some plumbing work. She later paid $123 to get the carpets cleaned. Karyn and Ron shared payment of the bills at the Wilmington house, but the utility, garbage, and water bills are in her name only.

¶ 10　　　After purchasing the house, Karyn and Ron began spending more time together. They went boating together and travelled to Matthiessen State Park in Ottawa, Illinois. Karyn attended Ron's granddaughter Emma Lynn's third birthday party, posting videos of the event on YouTube. Late in 2017, Karyn took Ron's five-year-old granddaughter, Annabelle, to see the Nutcracker in Bloomington. She paid for the tickets and posted on social media that she took her "granddaughter to her first ballet." In January 2018, Karyn took Annabelle and Emma Lynn to Disney on Ice. In March 2018, Karyn again attended a show with Annabelle and Emma Lynn. She paid for all the events they attended. In April 2018, Karyn took a vacation to Orlando where she visited SeaWorld with a man she called "Ron," but she denied that the man was "Ronald Hessa." From Orlando, Karyn drove to Talladega to attend a NASCAR race. She testified that Ron was not with her on this trip.

¶ 11       The circuit court found that Karyn and Ron were in a resident, conjugal cohabitation, which started in December 2017. The court stated that Karyn and Ron presented a common "narrative" on their living arrangement, but that "they also contradicted each other." It found that they went on a vacation to the Talladega Racetrack in Alabama. It also found the claim of a landlord-tenant relationship to be incredible because Karyn could not produce evidence of any rent payment to Ron. Finally, the court concluded that Karyn's relationship with Ron's granddaughters was that of family members. The circuit court terminated Karyn's maintenance effective December 2017.

¶ 12       Karyn has appealed that decision.

¶ 13                                II. ANALYSIS

¶ 14       Karyn argues that the circuit court erred in finding that she and Ron cohabitated in a resident, conjugal relationship. She contends that Ron was nothing more than the father of a friend and the landlord from whom she was renting space in the Wilmington house. She also contends that Tom failed to present any evidence supporting the assertion that she was in a relationship with Ron.

¶ 15       Illinois law provides "the obligation to pay future maintenance is terminated *** if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILCS 5/510(c) (West 2018). The burden of establishing the cohabitation is on the party seeking termination of the maintenance obligation. *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 25. To satisfy that burden, the party seeking termination "must make a substantial showing that the former spouse is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Thornton*, 373 Ill. App. 3d 200, 208 (2007). "Each case for termination of maintenance must rest on its own facts, given the unique nature of

5

personal relationships." *In re Marriage of Lambdin*, 245 Ill. App. 3d 797, 801 (1993). Illinois courts no longer require "proof of sexual conduct," so long as the party seeking termination can establish "facts which would lead a reasonable observer to believe that the individuals were [living as] husband and wife." *Id.* This Court has recognized six factors as relevant in finding a *de facto* husband and wife relationship: "(1) the length of the relationship; (2) the amount of time the couple spends together; (3) the nature of activities engaged in; (4) the interrelation of their personal affairs; (5) whether they vacation together; and (6) whether they spend holidays together." *Snow v. Snow*, 322 Ill. App. 3d 953, 956 (2001) (citing *In re the Marriage of Herrin*, 262 Ill. App. 3d 573 (1994)). This list of factors is nonexhaustive; the ultimate decision must be based on the totality of the circumstances. *Herrin*, 262 Ill. App. 3d at 577.

¶ 16　　　　The evidence presented shows that Karyn and Tom separated in August 2016. Around the same time, Karyn met Ron and changed her relationship status on Facebook from "married" to "in a relationship." She then moved into Ron's mobile home in Gardner, Illinois, living with him full time. Her son, Michael, stayed with them, using Ron's address on his official parole documents. During his stay, Michael never paid rent. In the meantime, Karyn began spending time with Ron's granddaughters. She took them to ballet performances and other theatrical events. She even posted on social media about those events, referring to the girls as her granddaughters. Karyn and Ron each owned several dogs that lived with them both in the Gardner home and the Wilmington house, with each caring for the dogs indiscriminately.

¶ 17　　　　Almost immediately, Karyn and Ron began pooling their financial resources in managing their daily lives. When Michael crashed Karyn's car in November 2017, Ron bought her a car for her exclusive use, putting down $800 on the price. Ron stated that he had an oral agreement with Karyn that she would reimburse him, and Karyn stated she paid $100 per month on the car.

6

Despite their testimony, there is no evidence of any money paid by Karyn to Ron for the car. Beyond this purchase, the intermingling of their financial resources dramatically increased in late 2017. During that time, Karyn put Ron's name on her bank account, which they began holding in joint tenancy with the right of survivorship. In October 2017, she transferred $23,000 into the account. Then in December 2017, she withdrew $12,305 from the account in the form of a cashier's check disbursed to "Karyn and Ronald Aspan" for purchasing the Wilmington home, which the evidence shows was and remains in Ron's name alone. Karyn also paid the house appraisal with $415 from the account. She then paid for plumbing repair and carpet cleaning in the Wilmington home and kept the utility, garbage, and water bills in her name only. During that time, she also began performing basic housekeeping tasks.

¶ 18 When Ron closed on the Wilmington home, he and Karyn celebrated together at Red Lobster with a gift card from the realtor. While living fulltime in the Wilmington home, Ron and Karyn shared a single bathroom and slept in the house every night. They also began spending a significant amount of time together, beyond their shared housekeeping duties. They went boating together and travelled to Matthiessen State Park in Ottawa, Illinois. In April 2018, Karyn took a vacation to Orlando, where she visited SeaWorld with a man she called "Ron." From Orlando, Karyn drove to Talladega to attend a NASCAR race.

¶ 19 A trial court's finding of a *de facto* husband and wife relationship will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004). Considering the evidence presented, we cannot say that the trial court erred in concluding that Karyn and Ron were in a *de facto* husband and wife relationship, despite the lack of any direct evidence of a sexual relationship. In *Thornton*, we found no conjugal cohabitation where the respondent denied she had an intimate, sexual relationship with the

brother of her former spouse. *Thornton*, 373 Ill. App. 3d at 210. The respondent had testified that she had allowed the brother to live in the basement of her house because he was essentially homeless. *Id.* at 209. We found nothing in the record—beyond the petitioner's bare allegations—to the contrary. *Id.* at 210. Summarizing the evidence, we stated:

> "There is no evidence of the amount of time, if any, [the respondent] spends with [her ex-spouse's] brother; the nature of the activities, if any, they engage in together; the interrelation, if any, of their personal or financial affairs; whether they vacation together; or whether they spend holidays together. In short, there is no evidence relating to five of the six factors that are to be used as the basis for determination." *Id.*

¶ 20 Karyn cited *Thornton* for the proposition that merely living with Ron does not meet the requirement for termination. However, as the evidence before us shows, Karyn's case is unlike *Thornton*. The evidence presented supports a finding that at least four of the six factors generally considered by the trial court were found satisfied. Karyn also contends that she paid rent and was still searching for a home while she lived in the Wilmington home. The trial court found this testimony—taken with Ron's supporting testimony—was nothing more than a story the parties tried to present as true and was not credible. We give great deference to the circuit court's factual findings because it stands in the best position to weigh the credibility of all witnesses. *Herrin*, 262 Ill. App. 3d at 577. In this case, Ron and Karyn failed to present any evidence at trial that could rebut the evidence presented by Tom and compel a conclusion that the trial court erred in its factual findings and its credibility assessments.

¶ 21          III. CONCLUSION

¶ 22 For the foregoing reasons, we affirm the judgment of the circuit court of Grundy County.

¶ 23        Affirmed.

**No. 3-19-0144**

| | |
|---|---|
| **Cite as:** | *In re Marriage of Aspan*, 2021 IL App (3d) 190144 |
| **Decision Under Review:** | Appeal from the Circuit Court of Grundy County, No. 2016-D-133; the Hon. Sheldon Sobol, Judge, presiding. |
| **Attorneys for Appellant:** | Karyn Mitchell, of South Wilmington, appellant *pro se*. |
| **Attorneys for Appellee:** | Zachary Pollack, of Pollack Law Group, of Joliet, for appellee. |