2025 IL App (1st) 240566

No. 1-24-0566

Opinion filed March 4, 2025

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| GEOFFREY CULM, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 16 D 1362 |
| | ) | |
| ALICE CULM, | ) | Honorable |
| | ) | Renee G. Goldfarb, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     Geoffrey Culm appeals the trial court's denial of his amended petition to terminate maintenance payments to his former wife, Alice Hawman.[1] Geoffrey contends that maintenance should terminate because Alice was in a *de facto* marriage with Michael Kolander. For the following reasons, we affirm.

¶ 2                              I. BACKGROUND

_____

[1]At the time of trial, Alice used her maiden name, Hawman. Because several witnesses share last names, we will refer to most witnesses by their first names.

¶ 3     Geoffrey and Alice were married in 1994 and had two sons together, both of whom are now adults. In 2016, Geoffrey filed a petition for dissolution of marriage, citing irreconcilable differences. The trial court entered a judgment of dissolution on March 30, 2017, which incorporated a marital settlement agreement. The settlement agreement required Geoffrey to pay maintenance to Alice for 15 years in the amount 25% of his annual income up to $500,000 per year, *i.e.*, $125,000 per year. The settlement agreement also provided that "Geoffrey's obligation to pay and Alice's right to receive maintenance shall terminate upon *** Alice's cohabitation with another person on a resident, continuing conjugal basis (in which case maintenance shall terminate on the date which a court of competent jurisdiction finds the cohabitation began)."[2]

¶ 4                          A. Amended Petition to Terminate Maintenance

¶ 5     In December 2021, Geoffrey filed the amended petition to terminate maintenance at issue in this appeal. Geoffrey argued that maintenance should terminate because Alice was in a *de facto* marriage with Michael Kolander. Specifically, Geoffrey contended that Alice and Michael (1) had been in a relationship since 2014, (2) lived in the same residential complex, albeit in different homes, (3) spent the night together approximately 66% of the time, (4) spent Thanksgiving together in 2020, (5) presented themselves as a couple to their families, and (6) took actions consistent with being in a committed relationship, such as helping each other with moving, caring for each other's pets, and engaging in public displays of affection.

¶ 6     Alice filed a motion to dismiss Geoffrey's amended petition pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)). Relevant here, Alice argued that

---

[2]This language tracks section 510(c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/510(c) (West 2016)), which governs termination of maintenance.

the petition's allegations did not support a claim that she and Michael were in a *de facto* marriage primarily because the petition did not even allege that she and Michael lived together. Geoffrey's response requested that the court deny the motion to dismiss and allow discovery as to Alice and Michael's relationship. Geoffrey also argued that the court could find that Alice and Michael were in a *de facto* marriage, even though they did not live together.

¶ 7                                    B. Trial

¶ 8    Geoffrey's amended petition to terminate maintenance proceeded to a bench trial in October and November 2023.

¶ 9                                    1. Alice Hawman

¶ 10    Alice testified that she and Geoffrey decided to end their marriage in 2013, separated in 2015, and divorced on March 30, 2017. Alice met Michael in 2012, when he was her personal trainer. She began an intimate relationship with him in late 2014 or early 2015 and their relationship became exclusive in 2016. In the fall of 2017, Alice broke off her relationship with Michael because she believed he was seeing another woman, but she began dating him again in 2018. Thereafter, Alice and Michael's relationship was "on and off"; they "went back and forth from dating [to being] just friends." Their sexual relationship ended in 2019 or 2020 (apart from one sexual encounter in 2021), and their dating relationship ended in 2022.

¶ 11    At the time of the divorce, Alice lived in the former marital residence on Hawthorne Street in Arlington Heights. In September 2018, Alice bought a residence in the Knollwood townhome complex in Palatine as an investment property. Michael lived in the same townhome complex, within walking distance of Alice's property, but Alice did not buy the Knollwood property to live near him. Alice renovated the Knollwood property between 2018 and 2020 and did not lease it

during that time. Michael did not help with or pay for renovation work.[3] In late August or early September 2020, Alice temporarily moved into her Knollwood townhome. Michael did not help with that move beyond taking "one or two carloads over, over the course of months." In late August or early September 2021, Alice moved to West Dundee, Illinois. Michael helped with some of that move but was not "in [Alice's] plans" regarding her new home. Alice leased the Knollwood residence to tenants in March 2022. She and Michael never discussed moving in together.

¶ 12    From late 2015 to March 2017, Alice and Michael saw each other for personal training "a few times every week" and met for dinner or coffee "maybe one other time during the week." Throughout their relationship, Alice and Michael sometimes spent the night at each other's homes, but "never spent more than two consecutive nights together *** except for a few trips." They communicated by phone call or text message daily, by Facebook messenger at least once a week, and occasionally by e-mail.

¶ 13    Alice and Michael cooked together at each other's homes and dined out together. They also socialized with at least three other couples. In 2015, Alice and Michael sold homemade Grateful Dead merchandise at a concert and split the proceeds. Also in 2015, Alice took care of Michael's cats when he was splitting time between Illinois and Texas. Michael had access to Alice's Knollwood and West Dundee residences to let service people in and take care of her dog. Michael cared for Alice when she had COVID-19, and Alice accompanied Michael to medical appointments when he was unable to drive.

---

[3]Michael did pay some of the contractors who performed renovation work when Alice was unable to, but she reimbursed him.

¶ 14    Alice and Michael took several trips together. In March 2015, they traveled to Michael's sister's home in Texas and went camping in a national park. In April 2015, they attended a wedding in Lake Geneva, Wisconsin. In May 2015, they traveled to Dallas, Tulsa, and St. Louis. In April 2016, they traveled to Kentucky for a concert. They traveled to Green Bay, Wisconsin, in September 2015, December 2018, and October 2022. They also traveled to Madison and Milwaukee, Wisconsin, and Peoria, Illinois. In February 2019, Alice and Michael spent the night in St. Charles, Illinois, to see a concert. In December 2019, they traveled to Sheboygan, Wisconsin. In February 2021, they traveled to Denver. They went to an art exhibit in downtown Chicago in 2021 and stayed at a downtown hotel on at least one occasion. In September 2022, Alice and Michael traveled to Indiana and Kentucky to visit a museum and attend a concert and a bourbon festival. On these trips, Alice and Michael stayed in the same accommodations and usually slept in the same bed. They split travel expenses "50/50."

¶ 15    Alice and Michael spent New Year's Eve together in 2017 at a concert in Milwaukee. They celebrated Thanksgiving together in 2020 due to being "in a small bubble" as a result of the COVID-19 pandemic. They also exchanged Christmas gifts and Valentine's Day cards. In 2022, Michael gave Alice a bracelet for her birthday. Otherwise, they did not celebrate holidays or birthdays together.

¶ 16    Alice and Michael had no joint bank accounts or credit cards, did not have access to each other's bank accounts or credit cards, and did not name each other as payable on death beneficiaries. They never discussed each other's income, taxes, or net worth and never made budgets together. However, Alice acknowledged that they texted about financial issues on two occasions. Michael had no financial involvement in any of Alice's residences, and they were not

cosigners or guarantors on each other's loans or mortgages. Alice did not provide for Michael in her will or other estate planning and did not give him power of attorney. Michael was not a beneficiary on any of Alice's retirement accounts or life insurance policies. Alice never named Michael as an emergency contact, and he never accompanied her to medical appointments. They did not receive mail at each other's addresses. When Alice and Michael's relationship ended, there were no financial matters they had to resolve.

¶ 17    Alice and Michael transferred money to each other on 64 occasions between September 14, 2015, and October 3, 2022. Most of the transfers occurred via Zelle, but six were checks that Alice wrote to Michael. The amount of each transfer ranged between $10 and $2300. In total, Alice transferred $19,120 to Michael, and Michael transferred $8795 to Alice. These transfers included payments for personal training sessions and short-term loans to each other, as well as reimbursements for travel expenses, sales of Grateful Dead merchandise, groceries Michael bought when Alice had COVID-19, comics and posters, a veterinary bill, and renovation work that Michael paid for on Alice's behalf when she was not home. Michael repaid every short-term loan Alice provided.

¶ 18    Alice described Michael to her sons, Sean and Jared, and her sister, Cheryl, as her personal trainer, a friend, and someone she was dating. Alice never told her sons that she thought "there was a future with" Michael. Michael did not accompany Alice when she visited her sons at college, and he did not attend their graduations. Michael met Alice's mother twice and her father once; Alice described Michael to her father as a friend. Michael did not accompany Alice on a trip to Arizona to visit her father in 2021 or on trips Alice took with her sons. Alice did not invite Michael to her sister Andrea's wedding.

¶ 19                    2. Michael Kolander

¶ 20    Michael testified that he met Alice in 2010 or 2011, when he began working as her personal trainer. They started dating in 2014, but their relationship was never more serious than "boyfriend, girlfriend[ ] or friends." Michael and Alice were in an exclusive relationship "[o]ff and on" between 2017 and 2022. During that time, Michael dated at least three other women. After March 2020, Michael and Alice had sex three times at most. In October 2022, their romantic relationship ended, and they decided to "just be friends." Michael and Alice never discussed moving in together, engagement, or marriage.

¶ 21    Michael and Alice spent nights together during their relationship, although Michael could not recall how often. When they both lived in the Knollwood townhome complex, they sometimes spent more than one night per week together, and they continued spending nights together after Alice moved to West Dundee. Alice never moved her belongings into Michael's home. She had a key and the garage code to Michael's home at Knollwood to feed his cats and bring in his mail when he was out of town. Michael had access to Alice's Knollwood home to let service people in and walk her dog. Michael did not do laundry at Alice's house.

¶ 22    Michael and Alice dined out and attended concerts and sporting events together; they either split the cost of doing so or took turns paying. They also cooked together at each other's homes. Michael and Alice socialized with another couple named Mark and Mary two or three times, and a couple named Dan and Jen once. Michael and Alice were never invited to parties as a couple. They never went out with Alice's best friend and did not attend any work events together.

¶ 23   Michael testified consistently with Alice regarding their trips together. He added that Alice was not invited to his friend's wedding they attended together, and only Michael gave a gift to the bride and groom. Michael and Alice never traveled with each other's family members.

¶ 24   Michael also testified consistently with Alice regarding their transfers of money to each other. Michael and Alice had no financial accounts together and did not have access to each other's bank accounts or credit cards. They did not pay each other's utility bills, credit card bills, insurance premiums, or car payments. They never discussed their net worth, life insurance policies, or estate planning and never met with a financial planner together. They had no joint debts and never paid each other's mortgages. Michael did not add Alice to his homeowner or car insurance policies. Alice was not involved with Michael's personal training business. Michael did not name Alice as a beneficiary on any of his bank accounts or investments. Michael and Alice did not receive mail at each other's homes. Michael listed Alice as his emergency contact when he was hospitalized in 2015 or 2016 but later removed her name. She dropped him off or picked him up for surgery.

¶ 25   Michael and Alice celebrated Thanksgiving together one time because it was a "Covid holiday." They also celebrated New Year's Eve, Valentine's Day "when [they] were together as a couple," dined out on Christmas Eve, and exchanged Christmas gifts. They did not send joint Christmas or birthday cards. Alice spent Easters with her family; Michael was not invited to and did not attend those celebrations.

¶ 26   On one occasion, Michael and Alice ordered appliances together because they received a discount for doing so, but the appliances were delivered to separate addressees, and Michael and Alice paid for them separately. The invoice for the appliances was addressed to "Mike slash Alice Kolander."

¶ 27    Michael met Alice's father and stepmother one time but never traveled with Alice to visit her father. He met Alice's mother "[a]t most a handful" of times. Michael also had dinner at the home of Alice's sister and her husband on one occasion. Michael knew Alice's sons but did not accompany her when she visited them at college, did not help with their moves to or from college, and did not attend their graduations. Michael did not go to Alice's sister's wedding. Alice met Michael's sister in Texas.

¶ 28                                    3. Geoffrey Culm

¶ 29    Geoffrey testified that he saw Michael at Alice's home twice between 2015 and March 2017. He did not see Michael at Alice's home when he dropped off and picked up Jared for parenting time exchanges between March 2017 and September 2018. In July 2020, Geoffrey hired a private investigator who went by the name Robert Arden, but whose legal name is Bing Avitz, to surveil Alice at the Knollwood townhome complex. In September 2020, Arden reported that he saw Michael kissing a woman who was not Alice, and that Michael was "two timing [Geoffrey's] ex," *i.e.*, Alice. Arden also investigated Alice and Michael's Facebook profiles and found nothing to suggest they held themselves out as a couple.

¶ 30                                    4. Robert Arden

¶ 31    Robert Arden testified via evidence deposition, by agreement of the parties, due to his unavailability at the time of trial. Arden was a retired private investigator. At the time of his deposition, he was on probation for placing a surveillance device on a car.

¶ 32    Arden initially testified that he began surveilling Alice in November 2020 but later testified that his surveillance began in July 2020. He attempted to observe Alice and Michael early in the morning and late at night. Arden saw Alice and Michael "leave from each other's house in the

early morning on 20 out of the 30 observed days." However, he did not conduct overnight surveillance, so he could not say with certainty whether Alice and Michael were together overnight at any time. Arden also did not conduct surveillance on holidays and did not know anything about Alice's out-of-state travels. Arden conducted a background check that indicated Alice and Michael did not share real estate or vehicles. Arden saw Michael kissing another woman on two occasions.

¶ 33                                5. Sean Culm

¶ 34    Sean Culm is Geoffrey and Alice's son. He was 27 years old at the time of trial. Sean knew Michael as "what [his] mother described as a kind of on again, off again relationship." Michael did not attend Sean's college graduation. After college, Sean lived with Alice for approximately one month in the summer of 2019. Michael did not live or spend the night at Alice's home during that time. When Sean moved to Minnesota, Michael did not help him move. Thereafter, Sean visited Alice every three or four months. He never saw Michael's belongings at Alice's home. Sean visited Alice at her home in Arlington Heights between 2018 and 2020 and never encountered Michael there; Michael did not live at that residence. When Alice told Sean that she planned to buy the Knollwood residence, she did not say she was moving there because of Michael. Sean stayed with Alice at the Knollwood residence for two nights in October 2020; he did not see Michael during that trip and did not see any of his personal effects at Alice's house. Sean also spent a long weekend with his mother at the Knollwood residence in May 2021; he did not see Michael during that trip either. At the time of trial, Alice lived in West Dundee, and Sean visited her there approximately every two to four months. Sean never encountered Michael at that residence and never saw his personal effects there.

¶ 35 Sean took several trips with Alice between February 2017 and June 2023; Michael did not accompany Alice on those trips or pay for them. During a trip in February 2021, Sean asked Alice if she planned to marry Michael, and "[s]he said she didn't plan on it. She didn't see it. They ha[d] a great, you know, friendship at times and sometimes a relationship, but she didn't see it coming to marriage." Sean and Alice often discussed buying rental properties and "flipping" houses in several locations across the country. Alice never expressed hesitation about those plans because of Michael.

¶ 36 Michael briefly stopped by during a Christmas celebration in 2020. His name was not included on birthday or Christmas cards that Alice sent Sean. Michael did not attend family gatherings or holiday celebrations with Alice. Sean communicated with Michael via text message one time to thank him for a used bicycle Michael gave him.

¶ 37 6. Jared Culm

¶ 38 Jared Culm is Geoffrey and Alice's younger son; Sean is his brother. Jared lived with Alice when he was in high school from 2014 to 2018. Michael did not live with Jared and Alice during that time. Jared knew Michael as a personal trainer and met him "a few times" in brief exchanges, beginning in 2017 or 2018. Michael did not attend Jared's high school graduation or help him move to college in Milwaukee. When Alice moved to the Knollwood residence, she did not say she was moving there because of Michael. When Jared stayed at Alice's Knollwood residence during college breaks, he did not interact with Michael. Michael did not accompany Alice when she visited Jared at college and did not attend Jared's college graduation. When Jared graduated from college and moved off-campus, Michael did not help with or pay for his move. Jared last interacted with Michael in the winter of 2020.

¶ 39   Michael did not attend family holiday gatherings, except for one occasion in 2020; he stopped by a Christmas celebration for 30 minutes to an hour. Michael's name was not included on birthday and holiday cards that Alice sent Jared, and Jared did not exchange Christmas gifts with Michael. Jared did not have Michael's cell phone number and never texted with him.

¶ 40                                    7. Cheryl Chan

¶ 41   Cheryl Chan is Alice's sister. Cheryl met Michael one time when she attended a personal training session with Alice and a second time when Michael and Alice came to dinner at Cheryl and her husband's house in 2020. Alice introduced Michael as her friend, not her boyfriend. Alice never expressed intent to marry Michael or be in a long-term relationship with him. Michael did not attend family gatherings with Alice. When Cheryl and Alice's father was in the hospital, Michael did not accompany Alice to visit him. Michael's name was not on birthday cards that Alice sent Cheryl.

¶ 42                                    8. Eric Hawman

¶ 43   Eric Hawman is Alice's father; he lives in Arizona. When Alice visited Eric in Arizona in February 2021, they did not discuss Michael. Eric met Michael one time for approximately an hour in April 2021 at Alice's home. Alice introduced Michael as her friend, and they did not exchange any signs of physical affection. When Eric was hospitalized in August 2023, Alice visited him in the hospital; Michael did not accompany her.

¶ 44                              C. The Trial Court's Ruling

¶ 45   On February 13, 2024, the trial court denied Geoffrey's amended petition to terminate maintenance, finding that Alice and Michael's relationship was not a *de facto* marriage. Specifically, the court found that Alice and Michael (1) had a lengthy and romantic but non-

monogamous relationship, (2) maintained separate households and finances, (3) took short trips together but split travel expenses, (4) did not present themselves to others as a permanent, mutually committed couple, and (5) did not include each other in long-term future planning. In addition, the court found that (1) Alice testified credibly regarding the transfers of money between her and Michael, (2) Sean, Jared, and Eric were credible, and (3) Arden's reports documenting his surveillance, on which he relied during his evidence deposition, were "less than credible."

¶ 46    Geoffrey timely appealed.

¶ 47                                              II. ANALYSIS

¶ 48    On appeal, Geoffrey contends that the trial court should have granted his amended petition to terminate maintenance because the evidence established that Alice and Michael were "in a long-term conjugal relationship."

¶ 49    The Illinois Marriage and Dissolution of Marriage Act (Act) allows divorcing spouses to enter into an agreement regarding maintenance payments, as the parties did in this case. See 750 ILCS 5/502(a) (West 2016). Under the Act, an obligation to pay maintenance terminates "if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." *Id.* § 510(c). The purpose of this provision "is to remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship, so that he or she can continue to receive maintenance from his or her ex-spouse." *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004).

¶ 50    When a party seeks to terminate maintenance, based on the recipient being in a "resident continuing conjugal" relationship, the moving party must show that the recipient is in a *de facto* marriage with a third party. *In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 111. If the

moving party meets that burden, then the nonmoving party must show that he or she is not in such a relationship. *Id.*

¶ 51    In reviewing a trial court's ruling on a petition to terminate maintenance, based on an alleged *de facto* marriage, we will reverse trial court's ruling only if it is against the manifest weight of the evidence. *Id.* ¶ 105. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Id.*

¶ 52                              A. Section 510(c) Analysis

¶ 53    This court's approach to the section 510(c) analysis has changed over time. Earlier decisions focused on whether the petitioner met the express requirements of section 510(c), *i.e.*, whether the petitioner showed that his or her former spouse's relationship with a third party was cohabiting, resident, continuing, and conjugal. *Id.* ¶ 116. For example, in *In re Marriage of Johnson*, 215 Ill. App. 3d 174, 180-82 (1991), we reversed the trial court's termination of maintenance because the ex-wife occasionally staying at her boyfriend's apartment did not make her a resident. Recent decisions have moved away from this strict application of section 510(c) and toward a more flexible analysis of whether the relationship at issue is "husband-and-wife-like." *In re Marriage of Larsen*, 2023 IL App (1st) 230212, ¶ 114. We will conduct that analysis below. Nevertheless, the statute still requires proof of cohabitation on a resident, continuing, and conjugal basis. 750 ILCS 5/510(c) (West 2016).

¶ 54    In this case, there is no dispute that Alice and Michael never lived together and never planned on doing so. Therefore, there is no basis for finding that Alice and Michael cohabited within the common meaning of that term, which is "living or dwelling together." See *In re*

*Marriage of Sappington*, 106 Ill. 2d 456, 464 (1985). Because Alice and Michael never cohabited, it is difficult to see how termination of maintenance under section 510(c) could be warranted. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 64 ("the absence of a shared residence and of shared housing resources, or, at least, a shared day-to-day existence, is a significant hurdle for a petitioner to overcome").

¶ 55    We acknowledge that some cases suggest that a couple can be *de facto* married without living together. See, *e.g.*, *In re Marriage of Susan*, 367 Ill. App. 3d 926, 927-30 (2006) (couple did not live together but spent "nearly every night together" for at least three years and had essentially unlimited access to each other's homes); *In re Marriage of Herrin*, 262 Ill. App. 3d 573, 575 (1994) (ex-wife's boyfriend slept at his own residence—which had no gas, heat, or hot water—to avoid becoming a resident at the ex-wife's home, thereby ending her maintenance payments). However, those cases are exceptions to the general rule that when two people have never lived together, they are not *de facto* married. *Miller*, 2015 IL App (2d) 140530, ¶ 64.

¶ 56    In his reply brief, Geoffrey argues that cohabitation is often "impossible to prove" because it takes place behind closed doors, citing *Crane v. People*, 168 Ill. 395, 396 (1897). *Crane* is a 128-year-old case involving the then-crime of "living together in an open state of adultery" (*id.* at 396), which has nothing to do with the section 510(c) analysis. That citation is unpersuasive, to put it mildly. Under modern cases such as *Sappington*, cohabitation is a fairly straightforward inquiry: does the couple at issue live together? In this case, that question has a straightforward answer: No. The fact that Alice and Michael never lived together is not dispositive of this case, but it is compelling evidence that section 501(c) does not apply.

¶ 57                                    B. *Herrin* Factors

¶ 58    As mentioned above, more recent decisions have explained that whether a *de facto* marriage exists is a fact-specific determination, based on the totality of the circumstances, and the ultimate question is whether the couple at issue has a "husband-and-wife-like" relationship. *Edson*, 2023 IL App (1st) 230236, ¶ 117. Courts consider six nonexhaustive factors to help determine whether a *de facto* marriage exists, including (1) the relationship's length, (2) the amount of time the couple spends together, (3) the nature of the activities they engage in, (4) the interrelation of their personal affairs, (5) their vacations together, and (6) whether they spend holidays together. *Id.* ¶ 112. Courts refer to these six factors as the "*Herrin* factors" because they originate from *In re Marriage of Herrin*, 262 Ill. App. 3d 573 (1994). Our supreme court has not adopted the *Herrin* factors (*Edson*, 2023 IL App (1st) 230236, ¶ 113), but it has not rejected them either.

¶ 59    Although the *Herrin* factors are helpful to the *de facto* marriage analysis, "courts should not take a checklist approach wherein they merely note the presence of certain facts that fit into each category." (Internal quotation marks omitted.) *Edson*, 2023 IL App (1st) 230236, ¶ 118. Rather, courts must consider that "many of the six factors can be present in an intimate dating relationship as well as a *de facto* marriage." (Internal quotation marks omitted.) *Id.* This distinction matters because an intimate dating relationship does not necessarily equate to a *de facto* marriage that warrants termination of maintenance. *Id.* ¶ 115. That is because

> "[i]ntimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended

permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." (Internal quotation marks omitted.) *Id.* ¶ 114.

We now apply the *Herrin* factors to the facts of this case.

¶ 60                                    1. Length of the Relationship

¶ 61    Case law suggests that the first *Herrin* factor, the length of the relationship, sets a somewhat low bar for finding a *de facto* marriage. Courts have found *de facto* marriages based on relatively short and inconsistent relationships. See, *e.g.*, *id.* ¶ 125 (four and a half-year relationship partly suggested a *de facto* marriage even though it included a four to six month separation); *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 27 (a two-year relationship that included only 11 months of exclusivity gave the appearance of a *de facto* marriage).

¶ 62    Alice and Michael's intimate relationship began in late 2014 or early 2015 and ended in 2022. Measured by start and end dates, the relationship lasted seven to eight years. However, Alice and Michael's relationship was not consistent. They stopped dating in 2017 and did not resume their intimate relationship until the following year. From that point to the end of the intimate relationship in 2022, they were not exclusive, at least from Michael's point of view. He dated at least three other women during his and Alice's off-and-on relationship. Arden confirmed that Michael was dating at least one other woman in September 2020. Alice and Michael's sexual relationship essentially ended in 2020. So, Alice and Michael were in an intimate *and* exclusive relationship for just two years, late 2014 or early 2015 to early 2017. Given the case law above, this factor weighs slightly in favor of a *de facto* marriage, considering the relationship's inconsistent and non-monogamous nature.

¶ 63                          2. Amount of Time Spent Together

¶ 64    The second *Herrin* factor examines the amount of time the couple spent together. A couple spending nearly every day and night together supports a finding of a *de facto* marriage. See, *e.g.*, *Walther*, 2018 IL App (3d) 170289, ¶ 28; *Susan*, 367 Ill. App. 3d at 930; *Herrin*, 262 Ill. App. 3d at 577. By contrast, a *de facto* marriage may not exist when the couple spends time together only on weekends and does not have "a day-to-day life together." *Edson*, 2023 IL App (1st) 230236, ¶ 132.

¶ 65    Alice testified that she and Michael "never spent more than two consecutive nights together," aside from a few trips. In the first half of their relationship, they saw each other for personal training a few times a week and for coffee or dinner one other time during the week. Michael testified that he and Alice sometimes spent more than one night per week together after she moved to Knollwood. Alice and Michael sometimes had coffee together in the morning and sometimes engaged in dating-like activities. Sean and Jared's testimony indicates that Michael was rarely at Alice's home when her sons lived with her. Arden saw Alice and Michael together 20 out of 30 days when they both lived at Knollwood. Based on the trial record, our best estimate is that Alice and Michael saw each other approximately one to four times a week over the course of their relationship. There is no indication they regularly spent every day or night together at any point in their relationship.

¶ 66    Geoffrey argues that Alice and Michael "shared a day-to-day existence" because they spent approximately 66% of their days together when they both lived at Knollwood. We disagree. Spending two out of every three days together is, by definition, not a "day-to-day existence." Moreover, Alice and Michael both lived at Knollwood for one year, September 2020 to September

2021. A couple spending approximately 66% of their days together for just one year, due in part to the convenience of living near each other, is not like a marriage, in which a couple spends almost every day together for many years, if not decades. Rather, it is more like a dating relationship.

¶ 67    Geoffrey also highlights that Alice and Michael communicated every day by text message or phone call. That is true, but this *Herrin* factor concerns how much time the couple *spent together* (see *id.* ¶¶ 126-33), not how much time they spent texting or calling each other. While daily phone communication is evidence that Alice and Michael had a close relationship, it is not compelling evidence of a *de facto* marriage. Nonromantic relationships often involve daily communication by phone, especially texting. Geoffrey cites no authority suggesting that frequent texting outweighs evidence that a couple's relationship never involved spending every day with each other. Accordingly, this factor weighs against a *de facto* marriage.

¶ 68                                3. Activities

¶ 69    The third *Herrin* factor concerns the couple's joint activities. "[S]ocializing and eating together either in the home or in public [are] characteristic of *de facto* marriages." *Id.* ¶ 139. "[D]ating activities"—such as dinners, movies, and drinks together—also support a finding of a *de facto* marriage. *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001). "We have also found evidence of a *de facto* marriage where the record demonstrates shared household chores, ranging from laundry to cooking to maintenance work." *Edson*, 2023 IL App (1st) 230236, ¶ 140.

¶ 70    The evidence indicates that Alice and Michael's social activities together (aside from traveling, which we address below) were limited. They had dinner or coffee together approximately once a week, occasionally cooked together, and socialized with other couples

perhaps four times in total. They sometimes attended concerts and sporting events, but they did not attend parties or work functions together.

¶ 71    Moreover, there is little evidence that Alice and Michael shared household chores. Michael did not help with renovation work at Alice's Knollwood residence, provided minimal assistance during her moves, and did not do laundry at her home. The closest thing to a household chore that Alice and Michael shared was occasionally taking care of each other's pets at their separate residences. That task is something platonic friends might do for each other, not something that a married couple would do. A married couple would have the same pets in the same residence, which Alice and Michael never did.

¶ 72    Geoffrey insists that Alice and Michael's activities together were "[j]ust like a husband and wife." This conclusory statement is based on a regurgitation of the trial testimony, without analysis or explanation. Accordingly, this factor weighs against a *de facto* marriage.

¶ 73                              4. Interrelation of Personal Affairs

¶ 74    The fourth *Herrin* factor "evaluates not whether the new *de facto* spouse financially supports the recipient but, rather, whether their personal affairs, including financial matters, are comingled as those of a married couple would typically be." (Internal quotation marks omitted.) *Id.* ¶ 154.

¶ 75                                    a. Finances

¶ 76    Important to the interrelationship analysis is the couple's financial relationship and whether it reflects the economic aspects of marriage. *Id.* ¶ 156; *Larsen*, 2023 IL App (1st) 230212, ¶ 154. A couple not sharing bank accounts or credit cards and not comingling funds suggests that a *de facto* marriage does not exist. See *Edson*, 2023 IL App (1st) 230236, ¶ 152; *In re Marriage of*

*Caradonna*, 197 Ill. App. 3d 155, 160 (1990). Not sharing real estate or personal property also supports a finding of no *de facto* marriage. See *In re Marriage of Lambdin*, 245 Ill. App. 3d 797, 804 (1993).

¶ 77    Alice and Michael had no financial interrelationship beyond occasional transfers of relatively small amounts of money to each other. They had no joint bank accounts or credit cards, did not have access to each other's bank accounts or credit cards, did not take out loans together, did not pay each other's bills, and were not named on each other's insurance policies. When Alice and Michael's intimate relationship ended, it had no effect on their respective financial affairs, and they did not have to do anything to decouple their finances from each other. That fact contrasts starkly with the end of a marriage, in which sorting out financial affairs is often complex.

¶ 78    Geoffrey argued that Alice and Michael "regularly transferred" money to each other. He also argued that they looked to each other for financial support in the form of "loans" and covering each other's expenses. See *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 106 (1999). While that is true, 64 transfers over 7 years averages to approximately 9 transfers per year, which is neither frequent nor regular. Practically speaking, Alice and Michael's exchanges of money were not like a husband and wife's finances. They were more like a dating couple or nonromantic friends repaying small expenses through digital applications like Zelle or Venmo. Indeed, the fact that Geoffrey and Alice had to Zelle each other money, rather than drawing money from a joint bank account, speaks to the complete separation of their finances. And the fact that they repaid all the small "loans" to each other suggests an effort to keep their finances separate, which is the opposite of what a married couple would do. Simply put, married couples typically do not lend each other money.

¶ 79    Geoffrey also claims that Alice and Michael "had a business together," in which they "illegally manufactured trademarked merchandise" and sold it "over the internet and at a concert." Assuming this refers to Alice and Michael selling homemade Grateful Dead merchandise, that is a dramatic overstatement. There is no evidence that Alice and Michael had an ongoing business together, much less that that they violated trademark law. On the contrary, Michael explained that Grateful Dead concerts customarily feature a market for the sale of fan-made merchandise.

¶ 80    Geoffrey cites *Walther* as an example of a *de facto* marriage in which the couple's finances were not intertwined. However, *Walther* involved other kinds of interrelationship that are not present in this case, such as the former wife sleeping at her boyfriend's home every night for a year, their children sharing a bedroom, and the couple publicly referring to themselves and their children as a family. *Walther*, 2018 IL App (3d) 170289, ¶¶ 24-30. *Walther* does not compel reversal. We find that Michael and Alice's lack of financial interrelationship weighs against a *de facto* marriage.

¶ 81                              b. Family Members

¶ 82    Evidence that a couple spends "a lot of time with members of both their families" and "present[s] themselves as a couple" supports a finding of a *de facto* marriage. See *Edson*, 2023 IL App (1st) 230236, ¶ 142. Courts have found *de facto* marriages when the couple maintains good relationships with each other's children. See, *e.g.*, *Walther*, 2018 IL App (3d) 170289, ¶ 14; *In re Marriage of Roofe*, 122 Ill. App. 3d 56, 60 (1984).

¶ 83    The evidence established that Michael had little interaction with Alice's family. He met Alice's sons, Sean and Jared, only a few times. He did not visit Sean or Jared at college, attend their graduations, celebrate holidays or birthdays with them, or exchange gifts with them. Michael

was not involved in Sean or Jared's post-college moves to other cities, and he communicated with them by phone either very little or not at all. See *Larsen*, 2023 IL App (1st) 230212, ¶ 159 (finding no *de facto* marriage where a boyfriend did not attend his girlfriend's child's graduation). Alice never expressed interest in marrying Michael to her sons, and there is certainly no indication that Sean or Jared viewed Michael as their stepfather. See *id.* On the contrary, the evidence indicated that Michael deliberately did *not* visit Alice's home when her sons lived with her.

¶ 84    Similarly, Michael met Alice's father one time and her mother just a handful of times. When Alice's father was in the hospital, Michael did not visit him with her. Michael met Alice's sister Cheryl twice. Alice introduced Michael to Cheryl as her friend, not her boyfriend or partner. Michael did not attend the wedding of Alice's sister Andrea. The only member of Michael's family Alice met was his sister in Texas, and that occurred just once. The lack of relationship between Alice and Michael and their respective families suggests a casual dating relationship, not a *de facto* marriage.

¶ 85    Geoffrey points to testimony that Michael had some degree of relationship with Alice's sister Cheryl and her husband Tom. For example, Cheryl and Tom had Alice and Michael over for dinner one time and had a few interactions with him over the phone. However, Geoffrey does not explain how that relatively minimal contact supports the conclusion that Alice and Michael were in a *de facto* marriage rather than casually dating. We find that it does not. People who are dating sometimes interact with each other's family members without developing meaningful, long-term relationships as they would in a marriage. This factor weighs against a *de facto* marriage.

¶ 86                                          c. Future Planning

¶ 87    A *de facto* marriage typically involves planning to be together permanently, *i.e.*, "*formal integration of the new relationship into future endeavors.*" (Emphasis in original.) *Id.* ¶ 156. Such integration includes plans to retire together, granting each other power of attorney, and naming each other as beneficiaries in estate planning documents or life insurance policies. *Id.* By contrast, when the parties are not beneficiaries of each other's financial accounts or life insurance policies, that suggests no *de facto* marriage exists. See *Edson*, 2023 IL App (1st) 230236, ¶¶ 71, 152.

¶ 88    Alice and Michael did not plan their futures together. They never discussed moving in together, getting engaged, or marrying. Alice and Michael were not beneficiaries on each other's bank accounts, investments, or life insurance policies. There is no indication they named each other as power of attorney or that they planned to retire together.

¶ 89    Geoffrey implies that Alice intentionally did not take steps to make her relationship with Michael permanent to avoid creating evidence that would support termination of maintenance. While some former spouses may do that (see, *e.g.*, *Herrin*, 262 Ill. App. 3d at 575), we see little evidence of such machinations in this case. Rather, the evidence suggests that Alice and Michael's relationship was casual, fluctuating from dating to being friends, and that neither of them expected a future together.

¶ 90    Altogether, the evidence established that Alice and Michael had almost none of the interrelationship that exists in a typical marriage. They had little interaction with each other's families, maintained separate finances and households, and did not plan their futures together. They rarely held themselves out as a couple, and there is no indication they ever intended to marry. Accordingly, we find that the fourth *Herrin* factor weighs against finding a *de facto* marriage.

¶ 91                                    5. Vacations

¶ 92    Evidence that a couple took multiple vacations together supports a finding of a *de facto* marriage (*Larsen*, 2023 IL App (1st) 230212, ¶ 163), even if the trips were short (*Walther*, 2018 IL App (3d) 170289, ¶¶ 29, 31).

¶ 93    Alice and Michael took at least 13 trips together between 2015 and 2022. On these trips, they stayed in the same accommodations and usually shared a bed. This factor weighs in favor of a *de facto* marriage, but only to a limited degree. With one exception—visiting Michael's sister in Texas in 2015—none of Alice and Michael's trips involved each other's families. *Cf. Larsen*, 2023 IL App (1st) 230212, ¶ 166 ("multiple vacations, which included trips to visit friends and family, as well as the inclusion of [the ex-wife's] children, suggests evidence of a *de facto* marriage."). In addition, Alice and Michael's trips were relatively short, and they split travel expenses evenly.

¶ 94                                         6. Holidays

¶ 95    A couple celebrating holidays and special events together supports a finding of a *de facto* marriage. *Id.* ¶ 169. That is particularly true where the couple exchanged holiday and birthday gifts. *Snow*, 322 Ill. App. 3d at 956; *In re Marriage of Toole*, 273 Ill. App. 3d 607, 612 (1995).

¶ 96    Alice and Michael celebrated the following special occasions together: New Year's Eve in 2017, Thanksgiving in 2020, one Christmas Eve, several Valentine's Days, and at least two birthdays in 2015 and 2022. On some of these occasions, they exchanged gifts, but they never sent out joint Christmas or birthday cards. Importantly, Alice and Michael never celebrated holidays or birthdays with each other's families, as a married couple typically would. Rather, they celebrated as dating couples generally do, *i.e.*, without others on birthdays, Valentine's Day, and New Year's Eve. The only "family-oriented" holiday Alice and Michael celebrated together, Thanksgiving in 2020, was due to social distancing during the COVID-19 pandemic.

¶ 97    Geoffrey argues that Alice, in her interrogatory responses and trial testimony, untruthfully minimized the holidays she spent with Michael. That is a question of credibility, and we generally do not disturb a trial court's credibility determinations. See *Edson*, 2023 IL App (1st) 230236, ¶ 105. We especially reject Geoffrey's claim that "[t]he sheer number of Alice's false statements, under oath, to the court are a clear indication that she will say whatever, whenever, without regard for the truth and without respect for the integrity of the legal system." This accusation is hyperbolic, unnecessary, and largely irrelevant to this appeal, given that we defer to the trial court's credibility findings. See *id.* Accordingly, we find that the manner in which Alice and Michael celebrated holidays weighs against a *de facto* marriage.

¶ 98    Considering all the *Herrin* factors together, the evidence established that Alice and Michael's relationship was intimate and relatively long-term, but not consistent or monogamous. Some of their activities, particularly their trips together, suggested a more serious relationship. But significantly, Alice and Michael did not take steps that would have made their relationship marriage-like, such as moving in together, joining their finances, building relationships with each other's families, and planning for a future together. Their relationship was, at most, an intimate dating relationship and not a *de facto* marriage that would warrant termination of maintenance under section 510(c).

¶ 99    Finally, we note our frustration with the hyperbole of Geoffrey's opening brief. Several examples are set out above, but the following paragraph is particularly inappropriate:

> "Looking to future cases, if the evidence here cannot prove cohabitation, then there will be a simple roadmap for every recipient of maintenance who has a sufficient level of assets—simply find a townhome nearby and do whatever you want, and maintenance is

still paid indefinitely. Sleep together as often as you want. Travel together all you want. Transfer all the funds you want. Share a daily existence. Hold yourself out as a spouse when it benefits you. Delete and fail to provide years of texts. Answer falsely under oath, repeatedly, in sworn interrogatories, and in testimony repeatedly contradict your own statements, the evidence and the statements of the other. None of those actions would matter. That would be a terrible precedent."

In addition to its unnecessary sarcasm, this paragraph is inaccurate. Geoffrey will not pay maintenance "indefinitely"; he will pay it for a total of 15 years, as he agreed to do 8 years ago when he signed the marital settlement agreement. This obvious exaggeration is unhelpful and unpersuasive, and we do not think our affirmance of the trial court's thorough and thoughtful decision sets "a terrible precedent."

¶ 100    Alice and Michael were not cohabiting within the common meaning of that term, so section 510(c) does not apply. Four of the six *Herrin* factors weigh against finding a *de facto* marriage. Accordingly, we find that the trial court's denial of Geoffrey's petition to terminate maintenance was not against the manifest weight of the evidence, and we affirm.

¶ 101                                    III. CONCLUSION

¶ 102    For the foregoing reasons, we affirm the trial court's denial of Geoffrey's amended petition to terminate maintenance payments.

¶ 103    Affirmed.

---

***In re Marriage of Culm***, 2025 IL App (1st) 240566

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-D-1362; the Hon. Renee G. Goldfarb, Judge, presiding. |
| **Attorneys for Appellant:** | Paul L. Feinstein, of Paul L. Feinstein, Ltd., of Northfield, for appellant. |
| **Attorneys for Appellee:** | Jonathan R. Standeford and Matthew C. Arnoux, of Arnoux Sharma Standeford, LLC, of Chicago, for appellee. |